Casey, C. J.,
delivered the opinion of the court:
This is one of a class of cases that has several times been before this court. They grow out of supplies furnished to the Indians in California shortly after the admission of that State. Their history is as follows: By act of Congress approved 28th September, 1850, (9 Stat. L., 519,) the President was authorized to appoint three Indian agents in California. And by act of 30th September, 1850, (9 Stat. L., 558,) an appropriation of twenty-five thousand dollars ($25,000) was made, “to enable the President to hold treaties with the various Indian tribes in the State of California.” Under the first act, Redick McKee, George W. Barbour, and O. M. Wozencraft were appointed Indian agents, but on the 15th October their functions as Indian agents were suspended, and they were appointed commissioners to treat with the Indians under the latter act. By the act of 27th February, 1851, the President was authorized to designate any officers or agents of the Indian department to negotiate treaties with Indian tribes. Under this act the powers of these gentlemen as Indian agents were restored, and they were designated to negotiate the necessary treaties. The instructions given to the commissioners in regard to the negotiation of the treaties by the Commissioner of Indian Affairs were of the most general and indefinite kind. Everything relating to the means to be employed *470 to quiet the Indians, and prevent outbreaks, were confided to their discretion, and to be governed and controlled by circumstances as they should arise.
The recent gold discoveries in the mountain regions of California had attracted a large white population. Serious disturbances occurred between them and the Indians, as early as July, 1850.
When the commissioners arrived in California, in the early part of 1851, the California State troops were in the field engaged in active hostilities with the Indians. The Commissioner of Indian Affairs writing to the commissioners in California in May, 1851, says that he has been informed by the War Department that it was necessary to commence active operations against the Indians, and in that event directs that one of the commissioners shall accompany each detachment of troops, so as to be ready to negotiate should the occasion favor or require it. He adds : “ What particular negotiations may be required it is impossible for this office to foresee; nor can it give any specific directions on the subject. Much must be left to the discretion of those to whom the business is immediately intrusted.”
In the exercise of this discretion the commissioners saw no other method by which collision and bloodshed between the Indians and miners could be prevented but by the immediate removal of the latter to reservations on the plains. And this was made an indispensable condition in all the treaties negotiated; the commissioners agreeing on the part of the United States to furnish the Indians on the reservation subsistence during the years 1851 and 1853.
The commissioners acted jointly up to about the 1st of May, 1851; they then divided the State into three districts, each one taking his separate district. Their action in this matter was approved by the Indian bureau. They continued to pursue the same policy as when acting jointly, reporting all their doings to the Indian department. All the treaties negotiated contained substantially the same provision for subsistence, and it is not denied, and fully proved if it were, that without such provision, or its equivalent, no removal of the Indians could have been accomplished, and no treaties of any value could have been negotiated with them.
Copies of the treaties negotiated were forwarded to the department in March, 1851. On their receipt the Commissioner of Indian Affairs wrote to the commissioners in California, announcing the executive approval of the treaties, and commending the skill and diligence with which they had performed their difficult and delicate duties. Up to this time only fifty thousand dollars of appropriation for Indian service *471 in California bad been made; and this sum was applicable by the terms of the appropriations themselves to negotiating treaties and not to the carrying out of their provisions. They would have been also entirely insufficient in amount.
All the treaties negotiated by the commissioners were afterwards rejected by the Senate.
On the 30th August, 1852, (10 Stat., 56,) Congress appropriated one hundred thousand dollars “for the preservation of peace with the Indians who have been dispossessed of their lands in California, until permanent arrangements be made for their future settlement.” The following was added : “Provided, That nothing herein contained shall be construed as to imply an obligation on the part of the United States to feed and support the Indians who have been dispossessed of their lands in California.” And by the act of 3d March, 1853, the President was authorized to make military reservations from the public domain in the State of California, and the sum of two hundred and fifty thousand dollars was appropriated to defray the expenses of subsisting Indians in California, and removing them to such reservations for protection. The annual appropriation acts from that time to 1858, inclusive, contained similar provisions for completing the removal and continuing the subsistence of these Indians.
The treaties having been negotiated, and the Indians removed to the reservations, they were there without any subsistence and without the means of obtaining any. The commissioners could not keep them there without feeding them. The treaties made provision for immediate supplies to them, and, not doubting their ratification, the commissioners commenced to provide the necessary supplies. Among others, Mr. Barbour entered into a contract with Colonel John C. Frémont, who delivered to one or more of these reservations beef to the amount of over one million pounds on the hoof, at fifteen cents per pound. Frémont took for the amount drafts drawn by Barbour on the Secretary of the Interior. On presentation these drafts were protested for non-acceptance, there being no appropriation for the purpose. The claim having been brought to the notice of Congress, an act was passed, approved 20th July, 1854, (10 Stat., 804,) appropriating the money to pay the claim, amounting to one hundred and eighty-three thousand eight hundred and twenty-five dollars, with interest from 10th June, 1851, at the rate of ten per centum per annum.
In February, 1852, Wozeneraft made a similar contract with Samuel J. Hensley, for nineteen hundred head of cattle at fifteen cents per pound. The cattle to the number of twelve hundred and eighty-five *472 (1,285) were delivered under this contract, amounting to ninety-six thousand three hundred and seventy-five dollars ($96,376.) Wozen-craft drew drafts on the Secretary of the Interior, which were in like manner protested for the same reasons as those given to Colonel Frémont. Hensley brought suit in this court to recover the amount. This court, held that there was no such legal liability on the part of the United States as could be enforced by a suit. They reported the matter adversely to Congress. Thereupon Congress, upon the facts and law as presented in the opinion of the court, held that the United States were bound to pay for the cattle delivered and fed to these Indians, and passed an act making the necessary appropriation for its payment. (12 Stat., 847.)
A similar contract was made by Wozencraft with Samuel Norris, who likewise brought suit in the Court of Claims; and on the 11th day of June, 1860, the court made an adverse decision and report against the claimant upon the same grounds and for the same reasons as prevailed in the case of Samuel J. Hensley, above stated. The case was reported to Congress, where the same was pending until the passage of the following joint resolution :
RESOLUTION for the relief of Samuel Norris.
Resolved, by the Senate and. Rouse of Representatives of the United, States of America in Congress assembled, That the claim of Samuel Norris, of California, for supplies furnished the Indians of that State, under contracts made with certain commissioners, or either of them, authorized to negotiate treaties with said Indians, and all papers relating thereto, be referred back to the Court of Claims for examination and allowance; and that, infixing the amount to be paid the claimant, the rule shall be the actual value of the supplies furnished at the times and places of delivery, of which due proof shall be made by the claimant.
Approved June 22, 1866.
Under this resolution the case has been again tried at the present term and a judgment rendered in favor of the claimant for the sum of sixty-nine thousand nine hundred dollars, ($69,900.)
Such is an outline of the history and character of the class of cases to which this belongs. It only remains to state more precisely how the claim in suit originated, and the grounds upon which it is presented before us for adjudication.
On the 14th April, 1849, Adam Johnston, of California, was ap *473 pointed a sub Indian agent on the Sacramento and San Joaquin rivers, in that State. On the 24th November, of the same year, John A. Sut-ter was appointed for the Sacramento, and Johnston’s agency confined to the San Joaquin. The Commissioner of Indian Affairs, in October, 1851, instructed Johnston to impart all the information and afford all the assistance he could to the commissioners, Barbour, McKee, and Wozencraft, in the performance of their duties.
After the conclusion of the treaties and the removal of the tribes to their designated reservations, the commissioners placed Johnston in charge of a large number on the Merced reservation, in the valley of the San Joaquin, in the spring of 1851. On the 1st November, 1851, J ohnston entered into a contract with Colonel Fremont for the delivery of twelve hundred beef cattle for the use of the Indians, and also a quantity of flour.
Johnston employed a person by the name of Savage to kill and distribute the beef to the Indians, the cattle then being on the Little Mariposa ranch, near the Indian reservation. The evidence shows that at least a large part of the supplies actually went to feed the Indians. Many of the cattle were doubtless stolen or permitted to stray away by the government agents in charge of them. On the 11th November, 1851, Johnson drew twenty drafts upon the Secretary of the Interior, for various amounts, reaching, in the aggregate, about ninety thousand dollars, in favor of John Charles Fremont. Three of these drafts, one for ten thousand dollars and two for five thousand, res pectively, were indorsed to the claimants by Frémont. Th ey brought suit in this court upon these drafts; and upon a general demurrer, filed by the Solicitor of the United States, we held that there was no authority to draw such drafts given to Adam Johnston by the United States, and that the claimants could not sue in their' own names on a contract made with Fremont, nor on a quantum valebat arising from the receipt and use of the cattlo from him. Thereupon the claimants asked leave to file an amended petition and to make General Frémont a party to the suit. This motion was allowed, and the cause has been fully heard on the evidence presented on the one side and the other, and ably argued by the counsel for the claimants and by the Assistant Solicitor for the United States.
Upon these facts the question arises as to the binding force and validity of the contracts upon the United States.
Had J ohnston authority to make the purchases 1 Or have the United States since ratified and adopted his acts 1 It is admitted that a subsequent ratification is equivalent to a precedent authority.
*474 The act of J une 30, 1834, section 7, (4 Stat. L., 757,) enacts : “ And it shall he the general duty of Indian agents and sub-agents to manage and superintend the intercourse with the Indians within their respective agencies, agreeably to law; to obey all legal instructions given to them by the Secretary of War, the Commissioner of Indian Affairs, or the Superintendent of Indian Affairs, and to carry into effect such regulations as may be presented by the President.”
The thirteenth section of the same act provides that all merchandise required by any Indian treaty for the Indians shall be purchased under direction of the Secretary of War, &c.' “And all merchandise required at the making of any Indian treaty shall be purchased under the order of the commissioners, by such person as they shall appoint, or by such person as shall be designated by the President for that purpose. And all other purchases on account of the Indians, and all payments to them of money or goods, shall be made by such person as the President shall designate for that purpose. And the superintendent, agent, or sub-agent, together with such military officer as the President may direct, shall be present and certify to the delivery of all goods and money required to be paid or delivered to the Indians.”
The powers and duties of the Commissioner of Indian Affairs are conferred and prescribed by the act of 9th July, 1832, (4 Stat. L., 564.) That act provides: “The President shall appoint, by and with the advice and consent of the Senate, a Commissioner of Indian Affairs, who shall, under the direction of the Secretary of War, and agreeably to such regulations as the President may from time to time prescribe, have the direction and management of all Indian affairs, and of all matters arising out of Indian relations.”
The Commissioner of Indian Affairs, representing in this behalf the executive department of the United States, approved and adopted what these commissioners and agents had done, in removing these Indians to the reservations, and providing them subsistence there. And this raises the question, whether such ratification and adoption by the executive authorities, there having been no direct precedent authority of law to make the contract, binds the United States. It is claimed that it was competent for the agent, under the previous authority, or by the subsequent ratification of the Commissioner of Indian Affairs, to provide for the necessary and usual supply of these Indians. It is also urged that the acts of 1832 and 1834 contain sufficient in their provisions to authorize contracts of the nature and character of the one set up in this case. That the sixth section of the act of May 1, 1820, (3 Stat. L., 568,) allows contracts to be made wherever there is *475 a law authorizing them, or an appropriation adequate to their fulfilment. That here there was a law or laws authorizing and empowering certain officers to have the charge, care, and control of the Indians; it was their duty to keep them quiet and orderly; and that whatever expenses were incurred, or money expended, in the performance of this duty, was a proper charge upon the public treasury, as having been made under the direct and express provisions of laws of Congress.
It is not denied very strenuously by the officers representing the United States that there was a moral and just obligation resting upon the United States to pay for these supplies. They had compelled or induced these savage tribes to remove from their known and accustomed homes and hunting grounds in the mountains to the dry and arid plains. , They were compelled to remain upon prescribed reservations. There was hut the alternative to supply them food, or let them starve or steal. To a just-minded person it is not difficult to decide which course was the right and true one to adopt. From all these considerations it is urged that the government, by its high executive officers, ratified and adopted the acts of these agents and made them binding on the United States as valid contracts.
But it is further contended that Congress, by its enactments, has given and superadded a legislative recognition to, and adoption of, this class of contracts growing out of the care and subsistence of these California Indians. First, by the act of the 3d March, 1853. By this act the President was authorized to make five military reservations from the public domain in the State of California, and the sum of two hundred and fifty thousand dollars was appropriated to defray the expense of subsisting Indians in California, and removing them to said reservations for protection. Similar appropriations were made each year thereafter up to 1858, inclusive, for completing the removal and continuing the subsistence of the Indians on those reservations.
Again it is claimed that the acts previously cited by which Congress appropriated money for the payment of the claims of Frémont and Hensley, and for the adjudication of Norris’s claim, were distinct legislative recognitions of these contracts. Or if not ratifications and adoptions of the very contracts made in the premises, at least acknowledgments of the justice of the claims, and the liability of the government to pay the fair value of the supplies delivered.
How far the government would be liable in cases of this kind, standing alone on the authority conferred and control given over Indian affairs to the Commissioner and agents under the acts of 1832 and 1834, it is not necessary for us to decide. It might he a fair subject *476 for discussion, wbetber the powers conferred and the discretion vested are not large and wide enough to bring a case of this description within the purview of the sixth section of the act of 1st of May, 1820, (3 Stat., 568.) But when taken in connection with the facts detailed, and the subsequent legislation cited, we think the case is free from doubt and difficulty. The maxim of the common law, omnis ratihabitio retro-trahitur, et mandato priori equiparatur, is as applicable to the contracts and obligations of the United States as to those of individuals. The only question in our case is, has there been such a ratification and adoption by competent authority 1
The supplies furnished out of which this claim arises were bought by and delivered to a regularly constituted agent of the United States, duly appointed in pursuance of law. They were moreover procured and fed to the Indians in accordance with the established practice and usage of the United States in their dealings with the Indiau tribes. From the earliest history of the government it has been the habit of the United States to remove the Indians from the encroaching white settlements to reservations provided for them, to avoid collisions and bloodshed, and to there subsist them and provide for them until they are able to supply themselves in their new homes, or are removed to new hunting grounds. The United States compelled these savages of the mountains to forsake their homes and hunting grounds where they could procure ample subsistence. It was done for the public good and peace, for the benefit of the white people flocking to the newly discovered gold mines of that region. They were restricted to a designated space on a barren plain. Being there by the superior force and authority of the United States, there was but one alternative, to feed them or starve them. The agents, and the government too, if they had permitted the latter, would have deserved the execrations of mankind. To induce them to remove without the employment of more than moderate force and compulsion, the agents, fully authorized by law and appointed for that purpose, entered into treaty stipulations with them for immediate and prospective supplies as the conditions and consideration of their removal to the reservations. The Indians performed their part by removing; the agents did no more than the United States had agreed to do, when they gave them the stipulated provisions. Had the treaties been ratified, they would have made the law of the case, and would have relieved the matter of all doubt or cavil. But the Senate of the United States rejected the treaties, and hence the controversy. Notwithstanding the rejection, the performance of their stipulations was exacted of the Indians. They were compelled to *477 remain on the reservations assigned them, and were not permitted to return to their native or accustomed haunts.
Under these circumstances there can be no doubt whatever that there was the strongest possible moral and equitable obligation on the part of the United States to provide subsistence for these savages. It was equally their interest, for it was cheaper to feed them than to fight them. These were the views entertained and the motives that influenced the agents and the Indian bureau in obtaining and furnishing these supplies. These contracts had the full sanction of all the authority the law conferred or the practice and usage of the government gave to the executive department in the premises. But the objection was still urged that such sanction and approval was unavailing because unauthorized by any legislative sanction; that whatever might be the equity of the claim, upon considerations of justice and morality, there was no direct authority of law to make the contracts, and no appropriation adequate to their fulfilment, and therefore within the inhibition of the act of 1820, and consequently not legally binding on the United States.
The claimants take up the cáse at this point, and contend that admitting the conclusion stated, Congress has by its subsequent legislation ratified and adopted the acts of the executive authorities in all this class of cases, and thereby superadded a complete and perfect legal obligation to what before appealed but to the moral sense and justice of the nation.
The legislation upon which that ratification is predicated has been recited above. It may cast some light upon the subject to look at the views entertained by the committees who reported the bills which were thus enacted into laws, as to the intention of Congress in .the enactments. In an elaborate report made on the 14th of July, 1854, to the House of Representatives by Mr. Orr, from the Committee on Indian Affairs, the committee say: “The treaties were rejected by the Senate for reasons which have not yet been made public, and the Indians of California have been driven from their lands and their homes, and have received no compensation from the government, save the beef furnished them by Colonel Frémont, and which he now asks the government to pay him for. The beef went into the hands of the agents of the government; whether it was'all faithfully distributed among the Indians by the sub-agents is not a question that is to affect the justice and equity of the claim of Colonel Fremont. He furnished the agents of the government with a large quantity of beef. Most, if not all of it, was used in feeding the Indians; it was furnished to comply: with treaty stipulations; it stopped the war and restored peace to *478 the country; and will the government now shield itself from the payment of this claim, and devolve a ruinous loss upon one of its own citizens upon the technical pretext that the agent had no specific authority to make the contract. We have received the advantages and benefit of the contract, and your committee believe it is just we should fay for it.
“ They accordingly report a bill for the amount, and recommend the payment of interest at the rate of ten per cent., (California interest.)”
In another part of the report the committee say : “ There was no express authority of law to make the contract, and yet the general authority with which he was clothed to treat, coupled with the emergencies of the occasion, fully justified him in assuming that the legislative and executive departments would sanction his purchase, which was to terminate the war, and save the Indians from perishing. The emergency was too pressing for him to await instructions from the department, or for Congress to meet and make the necessary appropriations, and your committee believe that the government should recognize the act of this agent, when it is manifest that he acted, in good faith, and as most humane, discreet men would have done under similar circumstances.” ,
Again they say : “ Will it be pretended, if Congress had been in-session at the time, and had been madefully acquainted with the emei-r geney, that it would have refused the appropriation ? It would be unjust to our national reputation to suppose that Congress would have allowed those Indians to perish from hunger after our own citizens had despoiled them. It was cheaper to feed than fight these starving savages, and the food furnished by Barbour was better economy than to have maintained battalions and regiments to subdue the Indians.”
In the case of Hensley, before stated, Congress has not only again recognized the justice and validity of these claims, but has given a legislative construction to the act of 29th July, 1854, passed for the relief of Colonel Fremont.
In the Senate of the United States, on the 6th March, 1860, Mr. Sebastian, from the Committee on Indian Affairs, presented a bill and report to pay Samuel J. Hensley the amount of his claims, although the Court of Claims had reported adversely thereon. In that report, after stating the facts — the necessity for immediate and prompt action, and that the government received all the benefit and avoided a bloody and expensive Indian war — the committee say : “ The United States have not adopted the new system inaugurated by those defunct treaties, *479 but it has sanctioned their main feature, that of providing homes and subsistence to all who wish to labor, and thus exchange their mode of life for that of the white man. The committee believe the United States have received great benefits from the means furnished by the claimants, in aid of its policy, and in relief of its treasury, and there is no reason why it should not reimburse them with a just indemnity. In doing so we invent no new principle, nor adopt any new policy. The United States have often repaid the expenses of the States in suppressing Indian hostilities. Had California undertaken the task of a pacification of the Indians by a war, she would have been the creditor of the United States for the expenses of it. Does it lessen the obligation that the more humane and peaceful policy of the Indian commission has effected the same object ? Finally, the principle involved in the whole class of cases, of which this is only one, was distinctly recognized by Congress, in an act passed July 29, 1854, in favor of Colonel John C. Frémont, one of those who furnished beef to the Indians, under contract with the commissioners, and by its provi- ■ sions he received near two hundred and forty thousand dollars. The same justice should be extended-to all the other claimants.” (Senate Doc., 36th Congress, 1st session, vol. 1, Eep. No. 111.)
The bill as reported by the committee passed the Senate, and having been sent to the House of Representatives for concurrence, was there referred to the Committee on Indian Affairs. On the 10th of April, 1860, Mr. Scott, from that committee, reported in favor of the bill. They conclude their report as follows : “ It is not necessary
for the committee to express any opinion on the legal question upon which the decision of the Court of Claims turned, there being no question that the beef, for which compensation is claimed, was furnished to officers of the government in good faith, and applied successfully to put an end to a war of extermination between the whites and Indians, in furtherance of the policy adopted by Congress; there can be no question that the government ought to pay for property so applied to public uses, and the committee accordingly recommend the passage of the bill, as passed by the Senate, for the relief of said Hensley.”
The bill was accordingly passed, and will be found in 12 Stat., 847. The joint resolution cited in the Norris case was in pursuance of the same general policy adopted by Congress.
It is not necessary for us even to consider what would be our opinions or conclusions, if the case stood on the contracts, as sanctioned *480 and approved by the executive authorities. We look upon the acts of Congress cited as clear and distinct legislative recognitions of the obligation of the United States to pay the fair value of the subsistence furnished to these'Indians, through their regularly constituted Indian agents. Nor do we think its effect was intended to be limited and confined to the cases actually paid. Such was the view entertained by Congress themselves of the effect of the payment in the Fremont case, that it was not so much the decision of a single case as the recognition of a principle embracing a whole class of cases. They all rest upon the same foundation of right and justice.
We are, therefore, of opinion that, upon the whole case, the claimants ought to recover. The price at which the cattle were alleged to have been sold was seventy-five dollars a head, and such is the amount claimed here. But it will be noted that the agreement was made, and the acceptances given in November, 1851, while the cattle were not delivered till the spring and summer of 1852. From the evidence given by the United States, it is apparent these cattle actually delivered by Frémont to Savage, the sub-agent, were inferior to the kind contemplated at the time of purchase, for the proof is pretty clear that they could have been purchased for from forty to fiffy dollars per head. And this action can be sustained only upon the implied engagement of the defendants to pay for the cattle furnished for their use, and that only involves what they were fairly and reasonably worth taking all the facts in the case, we cannot go beyond fifty dollars as the full value of the cattle at the time. As to the flour mentioned in the contract, there is no such clear and distinct evidence of delivery as we think necessary to charge the defendants, and wo therefore throw it out of the calculation.
The number of cattle sold were twelve hundred, and for which Johnston gave to Frémont his acceptances at $75 per head, amounting to ninety thousand dollars; of these twenty thousand were indorsed to Jackson & Co., the equitable claimants here, and the residue to other parties. As the difference in the value of the cattle delivered reduces the whole claim to sixty thousand dollars, so the proportionate reduction in this case will be six thousand six hundred and sixty-six dollars and sixty-six and two-third cents, leaving the net balance the sum of thirteen thousand three hundred and thirty-three dollars and thirty-three and one-third cents ($13,333 33J-) due claimants, and for which sum we direct a judgment in their favor.