Richardson, J.,
delivered the opinion of the court:
Upon the acquisition of California from Mexico, in the year 1848, and the discovery of gold in that newly acquired Territory, a sudden immigration of white population in large numbers overran and settled upon the lands, which up to that time had been occupied by the Indians, and to which they were supposed to have the title by right of possession.
The pioneer settlers and miners, bent on the acquisition of wealth from the rich gold fields in which the country abounded, bold and energetic, paid little or no regard to the rights of the Indians; and the natural and inevitable consequences, plunder, strife, murders, and war, very soon arose between the two races.
The general, prominent, and controlling facts concerning the early settlement of California, and the policy and conduct of the government and people of the United States towards the Indians within that Territory, have become so well known through official reports, public documents, judicial decisions, and authentic published narratives that they may be judicially taken notice of as part of the history of the country, and it is unnecessary to set them out in the findings or to recite them in the opinion of the court. (Frémont & Jackson’s Case, 2 C. Cls. R., 461; Frémont & Roach’s Case, 4 id., 252; De Celis’ Case, 13 id., 117.)
It is only the special facts and circumstances which have a direct and distinct bearing upon the issues involved in this case that it becomes important here to refer to.
In the spring of 1849 Adam Johnston was appointed sub-Indian agent on the Sacramento and San Joaquin Rivers, in California, and in the following November his district was reduced and his duties were confined to the valley of the San Joaquin only.
In the autumn of 1850 the encroachments of the whites upon the Indians had become great, and the troubles and con- *103 diets between tbe two races bad increased to sucli an extent that tbe legislative and executive brandies of tbe government were moved to take active measures for tbe safety and protection of both peoples. On tbe 28th of September of that year Congress passed an act authorizing tbe President to appoint three Indian agents for California; and on the 30tk of September a small appropriation was made “ to enable tbe President to bold treaties with tbe various Indian tribes in tbe State of California.” (Chaps. 82, 91, 9 Stat. L., 519, 558.)
Under these acts Eedick McKee, George W. Barbour, and Oliver Wozencraft were immediately appointed Indian agents and commissioners to negotiate treaties with tbe Indians in California. After tbe passage of tbe Act February 27, 1851 (9 Stat. L., 586, ch. 14, § 3), requiring all Indian treaties to be negotiated by such officers and agents of tbe Indian Department as tbe President might designate for that purpose, they were continued in their offices as Indian agents, with tbe same authority to negotiate treaties and under tbe same instructions before given to them.
Tbe instructions to tbe subagent and to tbe agents and commissioners were of tbe most general nature. Tbe department, as they were officially informed, was in possession of little or no information respecting tbe Indians of California, and those officers were left very much to their own discretion and judgment in determining what course to pursue. Tbe desired object to be attained by tbe agents and commissioners was alone distinctly specified, and that was “by all possible means to conciliate tbe good feelings of tbe Indians, and to get them to ratify those feelings by entering into written treaties, bind-on them, towards tbe government and each other.”
Upon tbe arrival of tbe commissioners in California in January, 1851, they found that hostilities bad increased to an alarming degree. Tbe State troops bad been called out by tbe governor at tbe request of subagent Johnston, and war was flagrant.^ Tbe commissioners came to tbe determination at once that peace could never be restored while tbe Indian tribes remained in tbe mountains which tbe miners were overrunning in search for gold. In February they succeeded in entering upon negotiations with these Indians, and by tbe end of March following they bad concluded several treaties with different tribes. These treaties were all founded upon two conditions precedent, *104 which have an important bearing upon this case: the one that the tribes in the mountains should descend to certain reservations in the plains which had been selected for them, surrendering their mountain territory to the United States; and the other that they should be supplied on these reservations with •certain quantities of beef and flour — a provision rendered nec•essary by the sterility of the soil and the absence of other ■means of support on the reservations. According to the reports of the commissioners, no other terms could have been agreed upon unless these had been first accepted. They were not only embodied in the treaties, among other provisions which have never been made public by the removal of the secrecy of the Senate in executive session in relation to them, but were immediately acted upon by both parties. The Indians removed to the reservations, and several tribes were placed in charge of Adam Johnston on what was called the Merced Reservation, within his district of the San Joaquin Valley. Other tribes were placed on other reservations.
In order to comply in part with the agreements made by the commissioners, Mr. Barbour, one of their number, entered into •a contract with John 0. Frémont to supply some of the tribes «o removed with beef and flour, and those provisions were supplied to them under that contract. (Act July 29, 1854, 10 Stat. L., 804, ch. 165; Senate Doc., Thirty-sixth Congress, first session, vol. 1, Rep. No. 111.)
Other similar contracts were made by Commissioner Wozen-craft with Samuel J. Hensley and with Samuel Norris. But Adam Johnston was left to provide for the tribes under his care on the Merced Reservation as best he could. The commissioners appeared to have given their direct attention to supplying the wants of the other tribes, and to have intrusted or abandoned the like duties in relation to those on the Merced Reservation to the subagent there in charge.
Under these circumstances Johnston supplied beef and flour to the tribes in his care through purchases from the claimants set forth in the findings, and through other parties. At the very outset, as soon as he began to furnish these provisions to the Indians, as early as June 21,1851, he wrote to the Commissioner of Indian Affairs explaining his action and giving his reasons for it. As he had then no specific instructions from the department on the subject, he asked expressly that if that *105 or any other proceeding of his clid not meet the approbation of the department he should be immediately so informed.
The commissioners also kept the department advised of all then transactions as expeditiously as the then condition of the country in relation to the transmission of letters admitted.
The department, and through the department the President, seem to have approved all the acts and doings of the commissioner and of the subagent; and we are unable to find in the correspondence of the commissioner, in the public documents relating to Indian affairs, or in the Congressional reports, any evidence of disapprobation of what was done by either of them.
The treaties • were rejected for reasons which are unknown; but the government has availed itself of the preliminary arrangements and contracts between the commissioners and the Indians, and has retained the lands surrendered without making any further agreement or treaty for extinguishing the Indian title.
The question now to be determined is whether or not the United States are bound to pay for the beef and flour purchased from the claimant by subagent Adam Johnston, and supplied through him to the Indians on the reservation under his charge. This question must be settled with reference to the laws in force at the time the transaction occurred and not according to subsequent statutes which have materially restricted the powers of-public officers in relation to making contracts and incurring expenditures on behalf of the United States. The provisions which now form sections 3079,3709,3733, and 3744 of the Devised Statutes were not enacted until long after the contracts set forth in the findings in this case were entered into and fulfilled on the part of the contractors.
Nor did the Act May 1, 1820 (3 Stat. L., 568), ch. 52, § 6, afterwards superseded by the act of 1801, ch. 84, § 10, which is incorporated into the Devised Statutes, § 3732, then apply to the business of Indian affairs, but it was restricted by its very terms to the Secretaries of State, the Treasury, War, and Navy. When these transactions occurred in 1851 and 1852, Indian affairs were under the Secretary of the Interior. The restrictions of that section were not made applicable to all the departments until June 23, 1800, when the act of that date, ch. 205, § 3 (10 Stat. L., 102), was passed, or until the passage of the Act March 2, 1861 (12 Stat. L., 220, ch. 84, § 10).
*106 Before the provisions of those statutes were enacted, in different years, the principal executive officers were in the habit of incurring liabilities on the part of the government in the performance of their general duties under any act of Congress, where not expressly restricted, with more regard to the object of the act than to any specific authority given by it in detail, with little reference to the amount of the appropriation, which was often inadequate at first, and with the view of afterwards applying to Congress for appropriations to meet the exiienses.
Claimants with whom such liabilities were incurred had no remedy except through Congress, since the government had not then consented to be, made defendants in any court or in any case. It was in part to relieve Congress from this class of claims that later, in 1855, this court was established.
By the Act June 30, 1834 (4 Stat. L., 735, ch. 162), a department of Indian affairs was established, with a Commissioner of Indian Affairs as its immediate executive head, and with supervision and appellate powers vested in the Secretary of War. (See also Act July 9, 1832, 4 Stat. L., 564, ch. 174.) The only direction there expressed in relation to purchases for Indians is foun<l in section 13, as follows :
“All merchandise required by any Indian treaty for tlie Indians, payable after making such treaty, shall be purchased under the direction of the Secretary of War [afterwards changed to Secretary of the Interior] upon proposals to be received, to be based on notices previously to be given, and all merchandise required to the making of any Indian treaty shall be purchased under the order of the commissioners, by such persons as they shall appoint, or by such person as shall be designated by the President for that jmrpose; and all other purchases on account of the Indians, and all payments to them of money or goods, shall be made by such person as the President shall designate for that purpose. And the superintendent, agent, or subagent, together with such military officers as the President may direct, shall be present and certify to the delivery of all goods and money required to be paid or delivered to the Indians.”
The same act provides, in section 7, that—
“ It shall be the general duty of Indian agents and subagents to manage and superintend the intercourse with the Indians within their respective agencies agreeably to law j to obey all legal instructions given to them by the Secretary of War [after-wards changed to Secretary of the Interior], the Commissioner of Indian Affairs, or the superintendent of Indian affairs, and to carry into effect such regulations as may be prescribed by the President.”
*107 By the Act March 3, 1849 (9 Stat. L., 395, ch. 108, § 5), establishing the Interior Department, the supervisory and appellate powers previously exercised by the Secretary of War in relation to all the acts of the Commissioner of Indian Affairs-were transferred to the Secretary of the Interior, and Indian affairs were placed under the newly-created department.
If the articles furnished by the claimants in this case come within either of the classes referred to in section 13 of the act of 1834 above set out, they were “ merchandise required to the making of a treaty,” which were to be purchased under the order of the commissioners; or they were such “other purchases” as were to be made by such person as the President should designate for that purpose. There can be no doubt that the' action of the commissioners designated to make the treaties with these Indians, in placing certain tribes on a reservation in charge of Subagent Johnston, to be taken care of and provided for by him, with all the attendant circumstances, was sufficient authority from them, so far as such authority was necessary, for him to furnish the provisions which they had agreed should be delivered to those tribes; and it is equally clear that the action of the Commissioner of Indian Affairs, in approving of the doings of Subagent Johnston, and of the course which in advance he gave notice that he should pursue, in relation to supplying the Indians under his charge with the beef and flour required by the terms of the negotiations, was equivalent to and became substantially aNlesignation by the President for that purpose. It was a complete ratification of what he had done, and rendered his acts binding on his principal from their date as fully as though he“had possessed original authority. Omnis ratihabitio retro trahitnr et mandato priori ceqidparatur.
Separated from each other as were the commissioners, the sub-agent, and executive officers at Washington, by long distances, and with limited means of communication, it was impracticable, if not impossible, in the exigencies of the case, to obtain in advance the formal designation and authorization which might have been required under other circumstances. A subsequent ratification was sufficient to cure that informality, and that may be inferred from the official reports and general conduct of the superior officers in relation to the matter.
The action of the Commissioner of Indian Affairs must be presumed to be the action of the President, according to the *108 well-settled, principle adopted in practice and recognized by tbe courts, that tbe President acts in the performance of most of Ms duties through an appropriate department of the government and through the chief officers charged with the immediate supervision of the affairs of that department. (Wilcox v. Jackson, 13 Pet., 498.)
The seventh section of the act above cited defines the duties of subagents in very general terms, and requires them to obey all legal instructions given to them by the Secretary of War (or by the Secretary of the Interior according to the subsequent act), and to carry into effect such regulations as the President might prescribe. The approval by the President and the Secretary of the Interior, through the Commissioner of Indian Affairs, of acts previously done by a subagent was a-substantial compliance with this provision of law.
The requirement that “the superintendent, agent, or sub-agent, together with such military officer as the President may direct, shall be present and certify to the delivery of all goods or money required to be paid or delivered to the Indians,” was a direction to the public officers charged with the duty of rnalc-ing or superintending such delivery. It was certainly no fault of the sellers of goods that the government officers did not, or as in this case apparently could not, comply with that provision of the statute. They ought not to be charged with the entire loss of their property on account of such neglect of the defendants’ officers. There is no doubt as to the delivery of the goods upon which the present claim is founded, nor as to their value.
This is not an action for the non-performance of a contract from which the defendants have had no benefit, but is an action for the value of goods actually sold and delivered for the use and benefit of the United States. That the beef and flour were applied to the legitimate use of the government the findings leave no room for doubt. The United States have retained the lands for the surrender of which by the Indians these supplies were given as part of the consideration agreed upon by their agents. They have never obtained or attempted to obtain any other extinction of the Indian title. That they have not performed all the terms agreed upon is no .reason why they should not pay for such purchases and deliveries of goods as were actually made through contracts with their agents as part 'of the consideration. (Clark v. United States, 95 U. S., 539; Brooke's Case, 2 C. Cls. R., 180; Johnson's Case, 4 id., 248.)
*109 Upon all the facts in the case, we are of opinion that the defendants became liable for the payment, at their actual and fair value, of the goods sold and delivered by the original claimants as set forth in the findings.
In this opinion we are strengthened by the course which 'Congress has taken in relation to several and to all similar claims whichit has acted upon, growing out of the supply of provisions to the Indians removed in other cases to reservations under the agreements made by these very commissioners at the same time and under the same circumstances as are set forth in these findings, and by the implied legislative recognition of the obligations incurred by the government in these transactions.
By the Act July 29, 1854 (10 Stat. L., 804, ch. 165), Congress directed the Secretary of the Treasury to pay John C. Frémont $183,825, for b&ef delivered to Indians who, as wé have before stated, were removed to reservations by the commissioners herein referred to.
Samuel J. Hensley brought an action in this court, in 1859, to recover for supplies furnished under like circumstances, and the court decided against him. But upon the report of the facts of the case, as was then required by law, Congress passed an act allowing to him the amount of his claim, $96,375. (Act June 9, 1860, 12 Stat. L., 847, ch. 86.)
Samuel Norris brought an action in this court on a like claim, and the court decided against him. Upon the report to Congress, they passed a joint resolution referring the claim back to the court “for examination and allowance,” and upon a rehearing the claim was allowed and judgment was rendered against the defendants for $69,900, and no appeal was taken. (Resolution June 22, 1866, No. 56, 14 Stat. L., 608; Norris’s Case, 2 C. Cls. R., 155.)
Since then this court, under its extended power to enter judgments, has passed upon two other similar claims growing out of these same transactions of the commissioners appointed to hold treaties with the California Indians in 1851 and 1852, and has given judgment in favor of the claimants in each case, in one for $-13,333, and in the other for $46,686. (Frémont et al. v. United States, 2 C. Cls. R., 461, and Frémont et al. v. United States, 4 id., 252.) Those judgments were acquiesced in by the defendants, no appeal having been taken by the Attorney-General.
*110 So far as the records show, it appears that all claims of this nature which have been made against the government in these California Indian transactions have thus been paid by the United States, except this one now under consideration.
On the part of the defendants, it is alleged that a former judgment has been recovered in favor of the defendants on the claims here in suit, and that judgment is now set up as a bar to this action.
It appears that in January, 1855, Belt & Co. made an assignment of these claims, or of part of them, to one Charles V. Stuart ; that Stuart commenced proceedings upon them in this court by petition dated or sworn to November 10, 1855; that the case went to trial, and on the 17th of January, 1859, a decree was entered of record that “ the court, having maturely considered the record in this case, are of opinion that the petitioner is not entitled to relief, and do determine accordingly.”
The whole record and evidence, with the opinion of the court, were then transmitted to Congress for its consideration, in accordance with the requirement of the then existing statute, since repealed (Act February 24, 1855, 10 Stat. L., 613, ch. 122, § 7). Congress has never taken any action upon the case beyond causing the report received from this court to be printed.. (Thirty-fifth Congress, second session, Rep. C. C., No. 190.)
It has been authoritatively determined by the Supreme Court that all assignments of claims against the United States made before the issuing of warrants for their payment are absolutely void, not only as against the government, but as between the assignors and assignees themselves, under the provisions of the Act February 26, 1853 (10 Stat. L., 170, ch. 81, § 1). These provisions were in force when the assignment set up by Stuart was made, and now form section 3477 of the Revised Statutes. (United States v. Gillis, 95 U. S., 407; Spofford v. Kirk, 97 U. S., 484.)
Belt & Co. had, therefore, an undoubted right, at any time before actual payment, to repudiate their assignment to Stuart; and this they’ did when in February, 1866, they brought this action to recover upon the same claims in their own names.
Moreover, Congress never acted upon the case transmitted to them by this court, and it never came to a final judgment there. At that time this'court had no jurisdiction to enter final and eonclusive judgments. It was required only to investigate *111 claims and report upon them to Congress. There the final action was to be had.
By section 8 of the act of 1855, above referred to, it was provided “ that the claims reported upon adversely shall be placed on the calendar when reported, and if the decision of said court shall be confirmed by Congress said decision shall be conclusive.”
It will thus be seen that Congress did not intend that the decisions of this court as constituted before the Act March 3, 1863 (12 Stat. L., 765, ch. 92), should be conclusive unless confirmed by legislative action.
When the act of 1863 was passed, enlarging the jurisdiction and powers of this court, the present claimant, or those whom she represents, had a right to bring an action upon the claims now under consideration. They would have had that right even if they had been parties or privies in the case of Stuart, then pending in Congress, since- there was nothing in the act to exclude them from the benefit of its provisions. It is clear that the proceedings in the case of Charles Stuart are therefore no bar to the present action.
On the whole case the claimant is entitled to recover the sum of $10,715.19, and null have judgment for that amount.