## CLARK *v.* UNITED STATES.

1. The act of Congress approved June 2, 1862 (12 Stat. 411), which makes it the duty of the Secretary of War, the Secretary of the Navy, and the Secretary of the Interior to require every contract made by them severally on behalf of the government, or by officers under them appointed to make such contracts, to be reduced to writing, and signed by the contracting parties, is mandatory, and in effect prohibits and renders unlawful any other mode of making the contract.

2. Where, however, a parol contract has been wholly or partly executed on one side, the party performing will be entitled to recover the fair value of his property or services as upon an implied contract for a *quantum meruit.*

3. In the present case, the contract for the use of the claimant's vessel, and for the payment of her value if she should be lost in the service of the government, was not reduced to writing. When in that service she was manned by a captain and crew furnished by the Quartermaster's Department and lost; but no negligence was attributed to them. *Held,* that the implied contract being such as arises upon a simple bailment for hire, the claimant cannot recover for her loss.

4. The forms of pleading in the Court of Claims do not preclude a claimant from recovering what is justly due him upon the facts stated in his petition, although there be no count in the petition as upon an implied contract.

5. No question having been raised as to the claimant's title to the vessel, and there being no suggestion of any concealment or suppression of the truth on his part at the time the agreement to compensate him for the use of her was made, she being then in Mexican waters, it would be bad faith on the part of the government, after getting her within its jurisdiction and into its possession, under the pretence of hiring her, to set up that the claimant, having obtained her from the Confederate government in 1863 in payment for supplies furnished to the Quartermaster's Department of that government, had no valid title to her as against the United States.

APPEAL from the Court of Claims.

This is a claim against the United States for the value of a steamer lost in the government service in September, 1865, and for her use for eight days before the loss occurred, at $150 per day.

The Court of Claims found the following facts : —

1. In September, 1865, at Brownsville, Texas, the claimant and Major O. O. Potter, an officer in the Quartermaster's Department, entered into an oral agreement, with the approval of General Steele, commanding the western division of Texas. The agreement was that the Quartermaster's Department should pay the claimant $150 a day for the use of the steamer "Belle ; "

but no specific contract was made, or to be made, as to time, until she had made a trial trip from Brownsville to Ringgold Barracks and return, to prove her ability to perform the service for which the Quartermaster's Department needed a steamer; and, if she made a satisfactory trial trip, the parties were then to enter into a formal written contract for her future use at the same price per day. It was also at the same time agreed orally that the Quartermaster's Department was to run the steamer on her trial trip at the expense of the government, and that if she were lost on her trial trip the government should pay for her whatever three disinterested men should estimate her value to be.

2. Under this agreement the claimant delivered the steamer to the Quartermaster's Department, at Brownsville. The quartermaster then put his own captain and crew on the vessel, and sent her to Ringgold Barracks. On her voyage, while thus in the service of the government, she was wrecked, and proved a total loss. Three disinterested persons were then agreed upon and requested by Major Potter and the claimant to appraise the value of the vessel. They so acted, and, by a written award, found the vessel to be of the value of $60,000. The claimant has also proved by evidence other than the award that $60.000 was the reasonable value of the vessel. The steamer was in the service of the government before her loss eight days. The United States has not paid for the value of the vessel nor for her service.

3. The steamer "Belle" was previously owned by, and in the military possession of, the Confederate government. The claimant acquired his title to her about the year 1863, taking her in part payment of a claim he held for supplies furnished by him to the Confederate Quartermaster's Department. At the time she was chartered by Major Potter, as set forth in the first finding, she was in the claimant's possession as alleged owner, and she was also in Mexican waters, beyond the jurisdiction of the United States.

Upon these facts the claim was dismissed.

The claimant then brought the case here.

*Mr. Enoch Totten* for the appellant.

*The Solicitor-General, contra.*

MR. JUSTICE BRADLEY delivered the opinion of the court.

The first objection made to the claim is, that the contract was not in writing, as required by the act of June 2, 1862, entitled "An Act to prevent and punish fraud on the part of officers intrusted with the making of contracts for the government." 12 Stat. 411. This act provides: —

"SECT. 1. That it shall be the duty of the Secretary of War, of the Secretary of the Navy, and of the Secretary of the Interior, immediately after the passage of this act, to cause and require every contract made by them severally on behalf of the government, or by their officers under them appointed to make such contracts, to be reduced to writing, and signed by the contracting parties with their names at the end thereof, a copy of which shall be filed by the officer making and signing the said contract in the 'returns office' of the Department of the Interior (hereinafter established for that purpose), as soon after the contract is made as possible, and within thirty days, together with all bids, offers, and proposals to him made by persons to obtain the same, as also a copy of any advertisement he may have published inviting bids, offers, or proposals for the same; all the said copies and papers in relation to each contract to be attached together by a ribbon and seal, and numbered in regular order numerically, according to the number of papers composing the whole return."

The act further provides that the officer shall affix an affidavit to his return, and makes it a misdemeanor to neglect making his return, and directs the heads of departments to furnish printed instructions and forms of contracts, &c.

It is contended on the part of the government that this act is mandatory and binding both on the officers making contracts and on the parties contracting with them; whilst the claimant insists that it is merely directory to the officers of the government, and cannot affect the validity of contracts actually made, though not in writing. The Court of Claims has heretofore held the act to be mandatory, and as requiring all contracts made with the departments named to be in conformity with it. The arguments by which this view has been enforced by that court are of great weight, and, in our judgment, conclusive. The facility with which the government may be pillaged by the presentment of claims of the most extraordinary charac-

ter, if allowed to be sustained by parol evidence, which can always be produced to any required extent, renders it highly desirable that all contracts which are made the basis of demands against the government should be in writing. Perhaps the primary object of the statute was to impose a restraint upon the officers themselves, and prevent them from making reckless engagements for the government; but the considerations referred to make it manifest that there is no class of cases in which a statute for preventing frauds and perjuries is more needed than in this. And we think that the statute in question was intended to operate as such. It makes it unlawful for contracting officers to make contracts in any other way than by writing signed by the parties. This is equivalent to prohibiting any other mode of making contracts. Every man is supposed to know the law. A party who makes a contract with an officer without having it reduced to writing is knowingly accessory to a violation of duty on his part. Such a party aids in the violation of the law. We are of opinion, therefore, that the contract itself is affected, and must conform to the requirements of the statute until it passes from the observation and control of the party who enters into it. After that, if the officer fails to follow the further directions of the act with regard to affixing his affidavit and returning a copy of the contract to the proper office, the party is not responsible for this neglect.

We do not mean to say that, where a parol contract has been wholly or partially executed and performed on one side, the party performing will not be entitled to recover the fair value of his property or services. On the contrary, we think that he will be entitled to recover such value as upon an implied contract for a *quantum meruit.* In the present case, the implied contract is such as arises upon a simple bailment for hire; and the obligations of the parties are those which are incidental to such a bailment. The special contract being void, the claimant is thrown back upon the rights which result from the implied contract. This will cast the loss of the vessel upon him. A bailee for hire is only responsible for ordinary diligence and liable for ordinary negligence in the care of the property bailed. This is not only the common law, but the

general law, on the subject.   See Jones, Bailm., p. 88 ; Story, Bailm., sects. 398, 399 ; Domat, Lois Civiles, lib. 1, tit. 4, sect. 3, pars. 3, 4 ; 1 Bell, Com., pp. 481, 483, 7th ed.

As negligence is not attributed to the employés of the government in this case, the loss of the vessel, as before stated, must fall on the owner.

Of course, the claimant is entitled to the value of the use of his vessel during the time it was in the hands of the government agents, which, as shown by the findings, was the period of eight days.   This value, in the absence of any other evidence on the subject, may be fairly assumed at what was stipulated for in the parol contract.   Though not binding or conclusive, it may be regarded as admissible evidence for that purpose.   Neither party thought fit to adduce any other.   The cases bearing on this subject are collected in Browne's Treatise on the Statute of Frauds, sects. 117–130 ; but they mostly refer to the question whether the contract, though void by the Statute of Frauds, can be regarded as conclusive evidence of the *quantum meruit*.   Whether or not it is admissible as some evidence, though not conclusive on either party, is apparently not much discussed ; though it seems to us that it may fairly be deduced from the tenor of the cases that the evidence is admissible.   At all events, that is our view.   As a declaration of the parties, it is entitled to some credence.

The stipulation in this case, as appears by the findings, was for $150 per day.   This would make the amount of the claim $1,200.   For this amount the claimant is entitled to a decree.

If objected that the petition contains no count upon an implied contract for *quantum meruit*, it may be answered, that the forms of pleading in the Court of Claims are not of so strict a character as to preclude the claimant from recovering what is justly due to him upon the facts stated in his petition, although due in a different aspect from that in which his demand is conceived.

The other objection relied on by the government in this case is, that the claimant had no valid title to the steamer as against the United States, having obtained her from the Confederate government, in 1863, in payment for supplies furnished to the

Quartermaster's Department of that government. This objection cannot be sustained. When the contract was made with the claimant, the vessel was in Mexican waters, and not subject to the jurisdiction of the United States. The claimant was applied to for its use. It was agreed that he should be compensated. No question was made about his title, and it is not suggested that he was guilty of any concealment or suppression of the truth in regard to it. Under these circumstances, it would be bad faith on the part of the government, after getting possession of the steamer and getting it within its jurisdiction, under pretence of hiring it of the claimant, to set up that he had no title to it. This is so obviously in accordance with the justice of the case, that we deem it unnecessary to make any further observations on the subject.

The decree of the Court of Claims must be reversed, and the cause remanded with directions to enter a judgment in accordance with this opinion; and it is                    *So ordered.*

Mr. JUSTICE MILLER, with whom concurred MR. JUSTICE FIELD and MR. JUSTICE HUNT, dissenting.

While I agree to the reversal of the judgment in this case, and to so much of the opinion as gives compensation for the use of the vessel before she was destroyed, I cannot agree to the more important part of the opinion, which holds the contract void because it was not reduced to writing.

The act of June 2, 1862, which is interpreted by the court to be a statute of frauds, making all contracts of the Departments of War, Navy, and Interior void which are not reduced to writing and signed by the parties, is not, in my judgment, properly construed.

It cannot be doubted that it was competent for Congress to impose upon the officers of these departments the duty of having all their contracts made in writing and filed in the proper office, without making absolutely void a parol contract made on a fair consideration and within the scope of their authority. In other words, Congress had a right to give such directions to those officers as would secure a statement in writing of the contract itself, for the use of the proper officers of the government, without making it obligatory on the individual contracting with

the government, so that his contract, otherwise valid, would be void for want of that formality.

Looking at sect. 1 of the statute, as it is cited in the opinion of the court, it will be found wanting in the essential words of all known statutes of fraud.

There is no declaration that a parol contract shall be void, or that it shall not be enforced, or that no suit may be sustained on it.

There is no language in it addressed to the party contracting with the government. It is obvious that the primary purpose of the statute — in my judgment, the only one — is to secure authentic and perfect statements of such contracts, and of the proposals, advertisements, bids, and all the papers relating to them, to be filed in an office at Washington, where they can be inspected by any one having an interest, and especially by those superior officers whose approval or rejection may affect their validity. The statute seems in terms to apply to contracts in existence when it was passed as well as to those to be made in future. Returns of all contracts are to be made and filed in the office created for that purpose, within thirty days, together with bids, advertisements, &c.

The second section requires the officer making these returns to verify them by affidavit; and the object of this undoubtedly was to have evidence on which the government could rely, of the precise nature of the contract, and of the circumstances under which it was made.

The third section imposes a penalty on the officer for failing to make returns to the proper office, as required by the statute, by a fine; but no penalty for making a contract not in writing and signed by the parties.

In short, I cannot conceive, looking to the whole statute, that Congress intended any thing more than to regulate the conduct of its own officers, in compelling them to furnish all the evidence in their power of the contract and the circumstances attending its negotiation; and it seems to me to be going a long way to hold that it was the purpose to establish an entirely new rule as to the validity of contracts, at variance with any law heretofore known in this country, or, perhaps, any other.

If that was the purpose, it is hard to see why contracts in the three departments mentioned are selected for the operation of the rule, while the far more numerous and equally important contracts of the Post Office, the Attorney-General's Office, the Treasury and the State Departments are left to be controlled by the law as it stood before.

If there is any branch of the public service where contracts must often be made speedily, and without time to reduce the contract to writing, it is in that of the army. Sudden occasions for supplies, for the occupation of buildings, for the transportation of food and munitions of war, are constantly arising, and in many of them it is impossible to do more than demand what is wanted, and agree to pay what it is worth. Did Congress intend to say that the patriotic citizen, who said "take of mine what is necessary," is to lose his property for want of a written contract, or be remitted to the delays of an act of Congress?

It seems to me that if Congress had been intending to enact a statute of frauds, they would have made some limitation of its operation to cases of future delivery of property or future performance of service, and would not have passed a statute like this, which, if its effect is such as the court declares, renders void all contracts for compensation for the thousand small services and supplies which are daily needed by those in the employment of the government for its use.

I think the construction given by the court unwarranted and unfortunate, and of sufficient importance to record my dissent from it.