Nott, J.,
delivered the opinion of the court:
The primary and important question in this case is whether the transportation contracts of the government are limited by law to the supplies of the same fiscal year.
The contract in the present case is not so limited in terms. On the contrary it binds the claimant expressly to “ receive during this fiscal year ending June 30, 1877, all such goods and supplies of the Indian Department as may be offered or turned over to him for transportation.” A subsequent article by fair implication makes this obligation reciprocal, except as to “ goods not exceeding in weight 1,000 pounds,” which the Commissioner of Indian Affairs in his discretion” may transport by other means.” Apart from statutory' restrictions the contract would probably be held to embrace all goods and supplies which the Commissioner of Indian Affiairs had occasion to ship over the claimant’s routes during the continuance of his, the claimant’s, contract.
Formerly, and, indeed, until recently, the transportation contracts of the government have extended through the transportation months of the year; that is to say, from May to November, when the .western rivers are navigable and the prairies traversable, and no attention whatever was given to the arbitrary division of the fiscal year. In the numerous transportation cases which have been before the court, we have not been able to find one contract which terminated on the 30th June; and it may be noted that in a previous action brought by the present claimant (5 C. Cls. It., 462), the contract contained no specified period of duration, and, in fact, had been continued and kept in operation from year to year.
Nevertheless, it is undeniable that the contract in suit must be construed, if possible, in accordance with such provision of law as may exist, and if it transcends the law regulating public contracts, the Commissioner of Indian Affairs, as a public agent, must'be held to have transcended his authority in making it. *543 In other words, the contract must be construed to mean “ suck goods and supplies of the Indian Department as may be [lawfully] offered to the contractor for transportation.”
The peculiarity of this case (assuming that the claimant’s theory of the law be correct) is that the Commissioner of Indian Affairs could buy supplies with money appropriated for the expenditures of one fiscal year, and pay for their transportation to the agencies with money appropriated for the expenditures of another fiscal year. That is to say, he might so manage matters that when the supplies reached the agencies the cost of subsisting Indians at those agencies would have to be charged at the Treasury partly to the appropriation for one year’s subsistence and partly to the appropriation for another year’s subsistence.
Formerly, as we have said, but slight attempts were made to keep these accounts of the government by fiscal years. Then a department was credited with so much appropriated for transportation, and the balance, if any, was brought over at the end of the year; and as outlays.were made, they were charged simply to transportation. But the recent policy of Congress has been to keep the public accounts by the fiscal year; and now a department is credited with no balance over, and every expenditure is charged, not to transportation generally, but to the transportation of that specific fiscal year for which that specific appropriation was made.
The provisions of law which express the legislative policy are gathered together in the title on appropriations (Title xli, Rev. Stat.), and particularly in § § 3660, 3664, 3665, 3675,3678,3679, 3690. A reading of those provisions will show conclusively, we think, that Congress have restricted in every possible way the expenditures and expenses and liabilities of the government, so far as executive offices are concerned, to the specific appropriations for each fiscal year. If the Commissioner of Indian Affairs •could have compelled the claimant (as the claimant contends he might) to cany the supplies for the ensuing year under his, the claimant’s, contract for the transportation of the current fiscal year, the Commissioner could prevent by such means balances of appropriations from lapsing and being carried back into the surplus fund of the Treasury, and thereby evade the purpose and defy the terms of the statutes.
When it is determined that a contractor cannot recover upon *544 his express contract, it becomes the duty of this court under the decision in Olarlc’s Case (95 U. S. R., 539), to inquire whether he may recover in quantum meruit, for services rendered upon the faith of that contract, and this though no count in the nature of assumpsit be set up in the petition.
Wilder, the claimant, was the transportation contractor of the Indian Bureau for the fiscal year ending June 30,1877, and one John H. Charles was the contractor for the fiscal year beginning July 1,1877. Charles was also the agent of Wilder and had conducted and transacted all of the business under Wilder’s contract. Wilder and Charles were also partners in business, and would share directly or indirectly in the profits or losses of both contracts.
The defendants have filed no plea charging Wilder with fraud or with fraudulent collusion with Charles, and where no issue of fraud has been made and tried, the majority of the court do not feel at liberty to impute fraud. Notice to Charles was notice to Wilder as to matters relating to Wilder’s contract; but notice to Charles personally as a contractor on his own behalf was not notice to Wilder in matters outside of the agency.
• In June, 1877, the Commissioner of Indian Affairs had purchased supplies for the ensuing fiscal' year; that is to say, by authority of the Appropriation Act March 3, 1877 (19 Stat. L., 291), he had contracted for supplies to be paid for out of that appropriation after it should become available, with the understanding that the goods should be deliverable to the government before the beginning of the year. In that month he directed the contractor to turn them over to Charles for transportation. The contract of Charles had not yet become operative, but he had intimated a willingness to transport the goods then, and it was in consequence of this intimation that the order of the Commissioner was given. Nevertheless he was not bound to receive the supplies untiFthe beginning of the ensuing year. When they were turned over for transportation he was not informed of the Commissioner’s order, and it was still during the life of Wilder’s contract. Instead of receipting for the supplies in his own name as for transportation under his own contract, Charles receipted for them in the name of Wilder as for transportation under Wilder’s contract.
Through an inadvertence of the contractor who turned over the supplies, this error was not discovered until afterwards. Subsequently Charles gave to the contractor receipts in his *545 own name, in order, as he says, that he might get his pay for his goods, but he presented no demand to the department under his own contract, and ascribed the transportation to Wilder and not to himself. He has also assisted in the prosecution of this case, and has testified as a witness for the claimant.
The court understands from both the evidence and the arguments of counsel that the real controversy is whether a recovery should be had at. the higher rates of the Wilder or the lower rates of the Charles contract; that it is' immaterial to Wilder and Charles whether the transportation be paid for to the one or the other of them, and that it is immaterial to the gov- ‘ ernment whether a recovery be in the name of Wilder or in the name of Charles so long as it be limited to the lesser rate, and so long as there be no liability over to the other contractor. Moreover, the conduct of Charles was the sole cause of this litigation; if anybody is to blame for it, he is the person; and it seems manifest to the majority of the judges that the court should not by a technical application of the law defeat a recovery by Wilder, in order that a cause of action maybe reserved for the benefit of Charles.,
In this view of the case the majority of the court hold as follows :
1. Charles by standing by and seeing the claimant Wilder recover in this case, upon payment to Wilder will be estopped from setting up any demand of his own for the transportation of the supplies referred to.
2. Charles was not bound to receive the supplies under his own contract-which had not yet gone into operation, and occupies the position of having turned them over to Wilder, and of having permitted Wilder to perform; and the defendants occupy the position of having received transportation services which they ascribe to Charles, but which he from the first has utterly disclaimed.
3. The defendants having turned the goods over for transportation at the rates prescribed by the Charles contract, the recovery of Wilder must be limited to those rates, and the Charles contract is also evidence to show the value of freight at the time the service was performed, and to establish the rate at which Wilder should recover in quantum meruit.
The judgment of the court is. that the claimant recover of the defendants the sum of $1,413.01.
*546 Drake, Ch. J.,
dissenting:
I dissent from the judgment just rendered, not because the-amount of it has not been fairly earned, but because it Avas not earned by this claimant.
The case, though occupying a large space in the finding of facts, can be stated, in its essential points, with brevity.
The claimant sues on a contract entered into between him and the Commissioner of Indian Affairs on the 25th of September, 1876, for the transportation, between that date and the 30th of June, 1877, of all such goods and supplies of the-Indian department as might, during thai period of time, be offered or turned over to him by the Commissioner or Ms agents. The transportation had to be done principally by steamboats running up the Missouri Diver from Yankton, Dak.
The claimant resided at Saint Paul, Minn., and gave no personal attention to the service under the contract, but intrusted the entire management of that to an agent, one John H. Charles, who, at Sioux City, Iowa, and Yankton, conducted all the operations under the contract, and was jointly interested with the claimant in the several steamboats which were engaged in carrying the supplies.. Of those vessels one was called Silver Lake, and the claimant owned one-half and Charles the other half of her.
On the 26th of May, 1877, Charles, still the claimant’s agent, entered into a contract with said Commissioner, by which he, for himself, and not as agent, agreed to “receive during the fiscal year ending June 30, 1878, all such goods and supplies of the Indian department as might be offered or turned over to him for transportation by the Commissioner or his agents, and transport the same.”
Bach of those contracts, for its own period, covered transportation from Sioux City to Standing Dock and Fort Peck Indian Agencies, but at different rates of compensation j that, of the claimant fixing higher rates than the other; for Fort-Peck, about two and a third times higher.
In order to secure the seasonable delivery of supplies at the Indian agencies far up the Missouri Diver, it was a usage of the Commissioner, where a contract for transportation to them was made before the beginning of a fiscal year, as in Charles’s *547 case, to purchase supplies in advance of that beginning, and to ship them, also, in advance of it, under such contract.
On the 5th of June, 1877, while the claimant’s contract was still in force, and had yet twenty-four days to run, one Booge, a contractor at Sioux City, had a large quantity of bacon ready for delivery to the Indian department, under his contract for furnishing Indian supplies for the ensuing fiscal year, to begin on the 1st of July, 1877, and end on the 30th of June, 1878.
On said 5th of June, Charles telegraphed, and wrote by mail, ■ to the Commissioner about this bacon, asking him to order its inspection, saying that he had a boat ready to load it, and would like to get it at the agencies while the water was in good stage; and requesting that all the supplies for Fort Peck especially should be forwarded as early as possible. The telegram and letter were each signed “John H. Charles, Transportation Contractor.”
On the 6th of June the Commissioner telegraphed the government inspector at Sioux City to inspect the bacon, and wrote to Booge to deliver it, when inspected, to Charles for. transportation under his contract.
The inspector, after inspecting the bacon, gave Booge a certificate of its inspection, and of his having delivered it to “ Charles, contractor for transportation.”
On the 13th of June, Charles knew that he was to have the bacon for transportation, and went to Yankton to superintend its shipment there on a steamboat; and he left with the inspector two blank receipts for the latter to fill up after he inspected the bacon. To those receipts Charles signed the claimants name, and not his oivn, and the inspector, knowing no reason why they were not proper receipts, filled up the blanks; thereby making it appear that the claimant, and not Charles, had received the bacon for transportation.
The bacon was sent by rail from Sioux City to Yankton, on the 14th and 15th of June, consigned to Charles, who there received and shipped it on the steamboat Silver Lake, taking therefor her bills of lading, filled up by himself, stating tha.t the bacon was shipped on his account.
On the 18th of June Charles returned to Sioux City, and was immediately called upon by Booge’s partner — Booge being absent, and having been so when the bacon was inspected and shipped from Sioux City — who informed him that the receipts *548 be bad left with tbe inspector, signed in tbe claimant’s name, and wbicb tbe inspector had filled up, were not correct, and that upon those receipts Booge could not get pay from tbe Indian Department for tbe bacon; and asked Charles to take them up and give bis own receipts in lieu of them; and then showed Charles the Commissioner’s letter, directing that tbe bacon should be shipped under Charles’s contract; wbicb letter be bad previously overlooked, and it then, for tbe first time, came to Charles’s knowledge. Charles immediately complied with this request by giving bis own receipts for tbe bacon, and taking up tbe others. Unfortunately, Booge’s partner, instead ■of destroying tbe receipts signed in tbe claimant’s name, let Charles have them; and out of that circumstance has grown tbe present controversy.
As before stated, the rates of transportation under tbe claimant’s contract were higher than those under Charles’s. If payment for tbe transportation could be got at those higher rates, it would amount to nearly $3,000 more than if got under Charles’s contract. Tbe claimant applied at tbe Indian Office for payment for tbe transportation of the bacon under bis contract at those higher rates, wbicb was refused, on the ground that tbe Commissioner bad ordered tbe bacon to be shipped under Charles’s contract, and not under tbe claimant’s. Tbe claimant brought this suit to recover that demand, insisting ■that he performed tbe service under hits contract, and should be paid accordingly. The majority of tbe court bold that be did, in fact, perform the service; but, inasmuch as tbe Commissioner did not order him to perform it, be can be paid no more than the rates fixed in Charles’s contract, under wbicb that •officer ordered tbe transportation to be done. I bold that tbe claimant did not, in any possible view, perform tbe service, and therefore is entitled to nothing. Tbe grounds of my judgment will now be stated.
I. This caséis clearly distinguishable from that of Clark v. United, States (95 U. S. R.., 539), for in that case tbe contract sued on was an oral one, wbicb did not bind tbe government; but inasmuch as it bad been performed on tbe part of Clark, tbe Supreme Court held that be ought to be paid what bis service was fairly worth to tbe government. Here, however, tbe contract sued on is a written one, lawfully executed, and tbe *549 question is whether the claimant actually rendered the service - for which lie claims pay.
II. The claimant’s contract binds the United States to pay him only for the transportation of such goods and supplies of' the Indian Depanrtment as should he offered or turned over to-Mm by the Commissioner of Indian Affairs or Ms agents, for transportation; and that officer did not turnover to the claimant the bacon in question; but, on the contrary, ordered it to be transported under Charles’s contract.
III. The claimant, though having no personal knowledge of the transaction, is, in law, just as much chargeable with full knowledge of it as if he had been personally present and acting; for Charles was his managing agent -in the business, and knew every fact in connection with it.
IV. There could be found no sort of evidence tending even prima facie to prove that the claimant performed the service, if the receipts which Charles gave in the claimant’s name had been destroyed when Charles took them up and gave his own receipts in lieu of them. When so taken up by the claimant’s agent who had given them, they ceased to have any sort of legal force or existence as the basis of any liability on the part of the defendants to the claimant.
V. Charles, the claimant’s agent, knew that the bacon was to be transported under his own contract, and not under the claimant’s ; and that knowledge bound the claimant as fully as if he had been there present; and yet, so knowing, he receipted in the claimant’s name for the bacon. Such receipts made no contract between the claimant and the government.
VI. If it be said that though the bacon was not delivered to the claimant under his contract, yet, as he actually did the carrying of it to the Indian agencies, he ought, ex cequo ei bono, to be paid for the transimrtation what it was reasonably worth, my answers are manifold. 1. That view changes the claimant’s position, from that of a contractor suing for a contract price, to tjuit of a common carrier recovering what he did not sue for. 2. The claimant having sued on an express written contract, averring performance on his part and claiming the stipulated price, he cannot be allowed to recover for that performance under a quantum meruit. 3. If he is to be treated as a common carrier, he cannot recover in this suit, because the steamboat which carried the bacon was hot his alone, but belonged to him *550 and Charles jointly, and the suit should be in their joint names' 4. But even if he could recover as a common carrier, it would not be at the rate specified in either of the contracts; but at the rates specified in the steamboat’s bills of lading, or, in the absence of such standard, the rates which the boat, at the time, carried other freight for between the same points. The bills of lading for this bacon express no rate of freight, and the court has not found what was the rate charged by the boat for carrying other freight. There is, therefore, no basis for computing the amount, if any, which ought to be paid. 5. But were it otherwise, the claimant has no right to recover as a common carrier, for the bills of lading, filled up by Charles himself, show that the freight, whatever it was, was paid to the boat at the time, and so nothing is due to her owners on that score.
Such are my views of this case. They lead me to the fixed conclusion, that the claimant’s demand has not the least foundation in law or justice, and ought to be dismissed.