Drake, Gh. J.,
delivered the opinion of the court:
The decision of this case brings under review the powers and duties of the board of public works of the District of Columbia, established under section 37 of the Act of February 21, 1871, “ to provide a government for the District of ColumbiaA (16 Stat. I/., 419). The portion of that section here involved is as follows:
“The board of public works shall have entire control of and make all regulations which they shall deem necessary for keeping in repair the streets, avenues, alleys, and sewers of the city, and all other works which may be intrusted to their charge by the legislative assembly or Congress. They shall disburse upon their warrant all moneys appropriated by the United States, or the District of Columbia, or collected from property holders, in pursuance of law, for the improvement of streets, avenues, alleys, and sewers, and roads and bridges, and shall assess, in such manner as shall be prescribed by law, upon the property adjoining and to be specially benefited by the improvements authorized by law and made by them, a reasonable proportion of the cost of the improvement, not exceeding one-tliird of such cost, which sum shall be collected as all other taxes are collected. They shall make all necessary regulations respecting the construction of private buildings in tbe District of Columbia, subject to the supervision of the legislative assembly.”
Those three sentences define and enumerate all the powers and capacities conferred upon the board by its organic law. Beyond those powers and capacities, and such, not named, as might beheld to be necessarily incident to them, the board had no powers whatever. It was a body with a limited range of powers, but within that range having great capacity.
A necessary incident of the exercise of the functions delegated to it was the power to enter into contracts for the performance of the various descriptions of work which it was authorized to have done; but its power to contract was limited, as to subjects-matter, and as to the form which its contracts *394 should assume. The words of limitation in the act are as follows :
“All contracts made by the said board of public works shall bedn writing, and shall be signed by the parties making the same, and a copy thereof shall be filed in the office of the secretary of the District; and said board of public works shall have no power to make contracts to bind said District to the payment of any sums of money except in pursuance of appropriations made by law, and not until such appropriations shall have been made.”
Under the law as thus stated the transactions upon which the claimant bases its demand took place. We have set forth those transactions very fully in the findings, but will state, as succinctly as may be, the particular facts on which a recovery here is sought.
The claimant entered into a written contract with the board of public works to perform a large quantity of work in paving-streets. In the contract it was provided that partial payments on account of the work should be made by the financial agent of the board, on the monthly estimate of the board’s chief engineer.
In regard to the work done under the contracts, one Oreecy was the claimant’s attorney, with general power to transact all business in connection therewith.
In conformity with estimates made by the chief engineer, the auditor of the board issued to the claimant and delivered to its said attorney twelve certificates on account of work done, one of which is the following, and all the rest were similar in form:
“No. 3453.] Office of the Board op Public Works, “Washington, D. G., October IQ, 1873.
“I hereby certify that I have this day audited and allowed the account of Neueliatel Paving Co., per E. E. Gaskin, ag’t, per C. E. Oreecy, att’y, for work (here the work is set out), amounting to five thousand dollars,.$5,000.
“ J. C. Lay, Auditor,”
Four certificates of this description, dated October 16,1873, were delivered to Creecy, the aggregate amount of which was $9,142.60.
Oreecy presented those certificates to the treasurer of the board for payment; who informed him thathehad no money, and *395 did not know when be should have any. Oreecy told Mm that he expected the board to carry out its part of the contract and pay him, or else it would be impossible for the claimant to go on with the work. The .treasurer suggested to Oreecy to call on the president of the board, and ask him to raise funds. Creecy did So, and a good deal of conversation occurred between him and the president, the details of which are given in the ■findings, and need not.be repeated here. The substantial part relied on by the claimant was the president’s advice to Creecy to borrow money on the certificates; his assurance that, if Creecy would do so, he would see that the hypothecated cer-. tificates' were cashed in time to prevent any loss to the claim - ant'; that Congress would certainly appropriate for its share of the improvements; and that the claimant should be among the first settled with. Oreecy hypothecated the certificates as collateral security for his notes, payable thirty days after date, for an amount almost equal to the market Amlue of the certificates.
On the 5th of November ensuing, Creecy received six other like certificates, aggregating $11,657.40, which he presented to the treasurer for payment, who replied that he had no funds. Creecy then applied again to the president, and urged him to prOAdde him with money, or the previously hypothecated certificates would become forfeited. The president gave him an order for $5,000 in sewer bonds in exchange for a certificate of like amount, those bonds being then worth 20 per cent, more on the dollar than the certificates; and told him to go'ahead with the work and not be discouraged; that he had better borrow some more money on the certificates; and that he, the president-,- would cash the hypothecated certificates before Creecy’s notes matured, if in his power. Creecy hypothecated this second batch of certificates (less one) and the sewer bonds, to secure the payment of his note at 30 days.
Again, on the 14th of March, 1874, Creecy received a like certificate for $4,983.98, and on the 27th of that month another for'$l,500; the history of both of Avhich was the same, in effect, as that of the two preceding batches.
The result of the whole matter was that all of the certificates were sold to pay Creecy’s notes, at 44, 48, 49, and 50 cents on the dollar, and the sewer bonds at 64; whereby the claimant ■ avers that it sustained a loss of $19,429.25; and to subject the defendant to the payment of that loss this suit is brought.
*396 That, to all appearance, the claimant suffered the loss complained of seems plain; but it is to us equally plain that the defendant is not bound to make good that loss.
The claimant’s counsel, at the argument, laid great stress on the fact that the act under which this court has cognizance of claims against the District of Columbia vests the court with equitable as well as legal jurisdiction ; and assuming that the facts entitle the claimant to equitable relief, they appealed to us to administer it. But this is simply a suit for damages, which may, and must, be recovered, if at all, by an action at law; and it is an elementary and fundamental principle, that equity cannot interpose where there is an available and complete remedy at law. To invoke the exercise of equity jurisdiction, there must be a case presented in which there is no such remedy, and this case is certainly not of that description. Treating it, therefore, simply as an action at law, we will consider it in the light of legal principles.
Deduced to its simplest form, it is an action to fix upon the defendant a liability wholly based on the conversations of the president of the board of public works; which conversations, it is claimed, constituted a contract binding the defendant to indemnify the claimant against the loss it suffered through forced sales of the certificates and sewer bonds, made necessary by the failure of the board of public works to pay them. Was that the effect, in law, of those conversations ?
In Barnes v. District of Columbia (91 U. S. R., 540) the Supreme Court of the United States elaborately considered the legal status of the District and of the board of public works, under the Act of February 21, 1871, and held, 1. That the District is a municipial corporation; and 2. That the board of public works was not an independent body, acting for itself alone, and forming no part of the-corporation; but was a portion of the corporation, to which was given the exclusive control of the streets and alleys; and the court likened the board “to an ordinary agent of the corporation.”
This decision settles those points, and necessarily, also, another point — the authority and right of the board to bind the District by contracts lawfully entered into by the board in relation to the matters committed to its exclusive coutrol.
This briugs up the question whether, in this case, the board did contract with the claimant to make good to it the loss it *397 .sustained, ns before stated. The answer to this question depends on the legal authority of the president of the board by his conversations to make a contract for the board.
It was not contended at the trial that any express authority had ever been given by the board to its president to contract verbally on its behalf in regard to anything. It seems to have been assumed that his position as president and executive officer, or, as lie is styled in claimant’s brief, “the recognized./actoium of the board, necessarily embodied in him the rightful authority to bind the board by his mere words. If this view be correct, then we should have to inquire whether his words amounted to a contract; but we are quite clear that it is not correct, in view of principles and doctrines which are too well settled to be questioned or disregarded.
The board of public works, as we have seen, was held by the Supreme Court to have been a mere agency of the District of Columbia. .The powers of this agency were vested in five individuals, having no corporate capacity, but merely acting as individuals intrusted with capacities and functions defined by law. The exercise of those capacities and functions was not committed to them jointly and severally, but jointly only. The language is — “The board ol‘ public works shall have entire control”; “ They shall disburse upon their warrant all moneys”; “They shall make all regulations which they deem necessary”; and there is nothing in the statute giving to any other than the collective body the power to contract.
In such a case the whole tenor of the authorities is adverse to the exercise by one of the agents of a power to bind the collective body, unless he were expressly authorized to do so. Dillon, in the third edition of his very able work on Municipal Corporations, says: “As a general rule it maybe stated that not only where the corporate power resides i n a select body, as a city council, but where it lias been delegated to a committee or to agents, then, in the absence of special provisions otherwise, a minority of the select body, or of the committee or agents, are powerless to bind the majority or do any valid act. If all the members of the select body or committee, or if all the agents are assembled, or if all have been duly notified, and the minority refuse or neglect to meet with the others, a majority of those present may act, provided those present constitute a majority of the whole number. In other words, in such case, *398 a major part of tbe whole is necessary to constitute a quorum, and a majority of tbe quorum may act.” (§ 283.) . We have no doubt that this is sound law.' Applied in this case, it is fatal to any claim to bind tbe defendant by tbe acts aud words of a minority of tbe board, particularly where it is a minority of one.
Another rule of law bearing here is thus stated in tbe same work: “ Tbe general principle of law is settled beyond controversy, that tbe agents, officers, or even city council of a municipal corporation cannot bind tbe corporation by any contract which is beyond the scope of its powers. This doctrine grows out of the nature of such institutions, aud rests upon reasonable and solid grounds. The inhabitants are tbe corporators; the officers are but tbe public agents of the corporation. .The duties and powers' of the officers of the corporation are prescribed by statute or charter, which all persons not.only may .know, but are bound to know. Tbe opposite doctrine .would be fraught with such danger aud accompanied with such abuse, that it would soon end in tbe ruin of municipalities, or be legislatively overthrown. These considerations vindicate both tbe reasonableness and necessity of tbe rule that tbe corporation is bound only when its agents or officers, by whom it can alone act, if it acts at all, keep within tbe limits of tbe chartered authority of tbe corporation.” (§ 457.)
Now, even supposing that the president of tbe board had a general authority to bind that body by bis verbal engagements, he could do so only to such extent and in regard to such matters as the board itself, even by its unanimous action, might have done) for tbe powers of a representative can never exceed those of bis constituent. We must look, then, for the board’s power, after work was done under a contract with it, and its auditor’s certificates of indebtedness therefor bad been issued to the contractor, to agree to make good to him any loss be might thereafter sustain through tbe hypothecation, and consequent forced sale, of tbe certificates, to pay debts contracted by him in connection with the fulfillment of his contract. We look in vain for any words in the law conferring any such extraordinary and dangerous power; and we cannot conceive it to be constructively incident to any power there granted.
But were all the preceding views unsound, that organic law contains two clauses which seem, to us irresistibly conclusive *399 against tbe claimant’s demand. Tbe first clause is tbis: All contracts made by said board of public works shall be in writing, and shall be signed by the parties making the same.”
At tbe trial tbe attention of claimant’s counsel was called to tbis language; and to avoid its effect be referred to tbe clause in tbe Act June 15, 1880 (1 Súpplmt. E. S., 502), giving tbis court jurisdiction of u all claims now existing against tbe District of Columbia arising out of contracts madé by the late board of public works”; and be contended that those words included all engagements made by or on behalf of tbe board, whether they were, when made, lawful or unlawful. This is tantamount to saying that tbe statute was intended to ratify every such engagement, written or oral, and, ex post facto, to give legal vitality and validity to what, when done, might have been wholly without either. It is not easy to conceive of a more indefensible position, and we shall not stop to discuss it. The inanifestintention of Congress wms to leave to the judiciary tbe determination, in each case, of tbe question whether the claim arose out of a contract of tbe board; and the decision of that question would necessarily require tbe court to declare whether the engagement relied on did, in law, constitute a contract. No decision on that point could be made without bringing into consideration tbe words — 11 all contracts made by said board shall be in writing.” If the board was legally incapable of making an unwritten contract, it could not in any possible way authorize its agent to make one.- The question, therefore, comes back to the effect of those words. Are they only directory, or are they mandatory'? If we had any doubt on this point, we should consider it settled by the Supreme Court of the United States in the recent' case of Clark v. United States (95 U. S. R., 539), which was decided on appeal from this court.
In that case the Act of June 2, 1862 “ to prevent and punish fraud on the part of officers intrusted with the making of contracts for the government” (12 Stat. L., 411), was construed. Its terms were as follows:
“Sec. 1. That it shall be the duty of the Secretary of War, of the Secretary of the Navy, and of the Secretary of the Interior, immediately after the passage of this act, to cause and require every contract made by them, severally, on behalf of the government, or by their officers under them appointed to make such contracts, to be reduced to writing, and signed by the contracting parties with their names at the end thereof, a *400 copy of wbicli shall be filed by the officer making and signing the said contract in the ‘returns office’ of the Department of the Interior (hereinafter established for that purpose), as soon after the contract is made as possible, and within thirty days, together with all bids, offers, and proposals to him made by persons to obtain the same, as also a copy of any advertisement he may have published inviting’ bids, offers, or proposals for the same; all the said copies and papers in relation to each contract to be attached together by a ribbon and seal, and numbered in regular order numerically, according to the number of papers composing the whole return.”
The case presented a claim which rested wholly on an oral agreement made by an officer of the Army, and the question was, whether such an agreement was forbidden by that act; and that involved 'the point whether the act was merely directory, or was mandatory. The court held -it to be mandatory, and thus expressed its views:
“ It is contended on the part of the government that this act is mandatory and binding, both on the officers making contracts and on the parties contracting with them; whilst the claimant insists that it is merely directory to the officers of the government, and cannot affect the validity of contracts actually made though not in writing. The Court of Claims has heretofore held the act to be mandatory, and as requiring all contracts made with the departments named to be in conformity with it. The arguments by which this view lias been enforced by that court are of great weight, and, in our judgment, conclusive. The facility with which the government may be pillaged by the presentment of claims of the most extraordinary character, if allowed to be sustained by parol evidence, which can always be produced to any required extent, renders it highly desirable that all contracts which are made the basis of demands against the government should be in writing. Perhaps the primary object of the statute was to impose a restraint upon the officers themselves, and prevent them from making' reckless engagements for the government; but the considerations referred to make it manifest that there is no class of cases in which a statute for preventing frauds and perjuries is more needed than in this. And we think that the statute in question was intended to operate as such. It makes it unlawful for contracting officers to make contracts in any other way than by writing signed by the parties. This is equivalent to prohibiting any other mode of making contracts. Every man is supposed to know the law. A party who makes a contract with an officer without having it reduced to writing is knowingly accessory to a violation of duty on his part. Such a party aids in the violation of the law. We are of opinion, therefore, that *401 the contract itself is affected, and must conform to the requirements of the statute until it passes from the observation and control of the party who enters into it. After that, if the officer fails to follow the further directions of the act with regard to affixing bis affidavit and returning a copy of the contract to the proper office, the party is not responsible for this neglect.”
This decision bears with controlling force on the present case. If the Supreme Court would express those views in regard to an act which merely imposed on heads of executive departments the duty to see that all contracts made by their officers should be reduced to writing, much more, it seems to us, would it apply them to a statute declaring that ali contracts made by said board shall he in writing.” We hold, therefore, that the words of the president of the board of public works constituted no contract whatever on the part of that board, or of the District of Columbia.
The second clause of the organic law of the board touching this matter is that declaring that the board “ shall hare no power to malee contracts to hind said District to the payment of any sums ■of money, except in pursuance of appropriations made hy law.” There is no question here as to whether the words are directory or mandatory. They are a plain prohibition, an absolute interdict. To sustain the claimant’s demand, in the face of them, is impossible, even on the supposition that the president had power to contract by word of mouth for the board, unless-it appear that an appropriation had previously been made by law, authorizing the particular contract he might attempt so to make. Of course, there is no pretense that any appropriation was ever made, by any law, for paying contractors’ losses on forced sales of auditor’s certificates of the board, under the circumstances of this case or under any other.
And so, in every view, as well on general legal principles as under statute law, the present demand is singularly destitute of any valid claim to judicial recognition.
The claimant’s petition is dismissed.
Nott, J., was not present at the trial of this case,-and took no part in its decision.