## MATTHEWS et al. v. CONTINENTAL ROLL & STEEL FOUNDRY CO.

### No. 7672.

Circuit Court of Appeals, Third Circuit

June 30, 1941.

Charles F. C. Arensberg, of Pittsburgh, Pa. (Patterson, Crawford, Arensberg & Dunn and Ella Graubart, all of Pittsburgh, Pa., on the brief), for appellant.

Elder W. Marshall, of Pittsburgh, Pa. (A. M. Oliver and John C. Bane, Jr., both of Pittsburgh, Pa., on the brief), for appellees.

Before BIGGS, CLARK, and JONES. Circuit Judges.

BIGGS, Circuit Judge.

In 1934 one of the appellees, Percy W. Matthews, a mechanical engineer, was the originator of three devices which he wanted to exploit. These consisted of a four-high rolling mill, a flying shear and a heat controlling device. By August, 1934, he had filed applications for patents on the first two devices and was in the course of preparing an application for a patent on the third. It should be pointed out that this was the period in which four-high mills made under the Steckel patents were coming into the market. The appellant, the Continental Roll and Steel Foundry Company, is a manufacturer of steel-mill machinery. Matthews went to the appellant in an effort to interest it in his inventions, Continental being a competitor of other manufacturers of steel-mill machinery which had been licensed under the Steckel patents.

Negotiations between Matthews and those associated with him who are the other appellees or their representatives, and the appellant, represented by Lloyd Jones, a vice president, began in August, 1934. About this time Matthews submitted an opinion of his counsel to Jones to the effect that his four-high mill was not within the scope of the Steckel patents. Matthews and Jones discussed the preparation of an agreement. Matthews submitted to Jones a draft of a proposed agreement on August 22, 1934. This provided inter alia for an exclusive license from Matthews and his associates to the appellant under Matthews' applications, for the creation of a trust fund for prosecuting and defending infringement suits and for the payment of a minimum annual royalty to Matthews and his associates. We cannot doubt that some agreement of this sort was in the minds of the negotiating parties for Jones gave Matthews a paper in which he set forth in his own handwriting a proposed royalty scale. By September, 1934, Matthews and Jones seemed close to an agreement. By October, 1934, a second draft of the proposed agreement was being

worked on by Matthews and Jones. There is evidence that Jones was keeping the president of the appellant, Jay T. Osler, fully informed of the negotiations. At Jones' request Matthews joined the appellant's staff as an engineer on October 2, 1934. Part of his duties were to develop designs for machinery to be made in accordance with his patent applications and to prepare bids for submission to steel manufacturing companies. From October, 1934 to June, 1937 Matthews worked for the defendant in Pittsburgh, Pennsylvania and East Chicago and Gary, Indiana.

In February, 1935, American Sheet and Tin Plate Company accepted a bid made by the appellant to build rolling mills at Gary, Indiana. Included in this contract was a flying shear to be made in accordance with Matthews' application and specifications. The acceptance of the appellant's bid by American Sheet and Tin Plate Company kept Matthews busily engaged for some months. Matthews testified, "* * * we worked night and day on that job; and I don't think any time was spent on the agreement until later, in May, for the simple reason we didn't have a minute's time for anything." Matthews also testified that Jones agreed for the appellant that the sum of $10,000 should be paid to Matthews and his associates to reimburse them for part of the expenses incurred in developing the flying shear and carrying the application through the Patent Office. Matthews testified that the item of $10,000 was actually included in the bid given by the appellant to American Sheet and Tin Plate Company and was to be paid upon delivery of the flying shear to that company.

In May, 1935, Jones wrote an interoffice communication to President Osler which shows plainly that the shear was being built under Matthews' application, with whom, said Jones, "* * * we will shortly have to sign an agreement * * *." Thereafter Jones asked Matthews to prepare an agreement which could be presented to the appellant's officers for their consideration. Matthews testified that he complied with this request and on May 28, 1935, he had a conference with Jones, Osler and others. Matthews testified that Osler stated that the terms of the proposed contract were "harsh" but added, "* * * if, gentlemen, we all live up to the terms and clauses in this agreement, it can't hurt anybody." The contract was not signed, however.

A fourth draft, which Jones told Matthews he had prepared, was given to Matthews for his signature and those of his associates. It proposed, inter alia, a minimum royalty beginning in the calendar year 1936, and provided for the exploitation of Matthews' inventions. Matthews and his associates rejected it. In November, 1935, Matthews presented Jones with a fifth proposed agreement and Jones promised to submit this agreement to Osler for his signature. In January, 1936, there was another meeting between Osler and Matthews in Osler's office at East Chicago, Indiana, at which time the fifth draft of the proposed agreement was discussed. According to Matthews' testimony, he requested Osler to have the agreement executed but Osler replied, "The signing of the contract is just a mere detail", and "This is an agreement between us; we have agreed as gentlemen to live up to it and we are going to do it. This is our agreement which we are working under * * *." The agreement was not executed.

Matthews worked at Gary, Indiana, on his flying shear from early in 1935 until the middle of 1937. The shear did not work properly. Matthews contends that this was neither his fault nor the fault of the shear. He stated that the shear "lay around" the American Sheet and Tin Plate Company mill at Gary for about two weeks and endured "every rotten condition that any piece of machinery could be subjected to * * *", and that the machine was endlessly abused. The fact is plain, however, that the shear did not work. The appellant contends that this failure was caused by the inadequacy of the design. It is undisputed that the appellant had to take the shear out of the Gary plant and sustained a loss of $135,000 upon the whole operation. This failure caused friction between Matthews and the appellant and the connection between them came to an end shortly thereafter. Matthews and his associates instituted suit on February 3, 1938, in a Pennsylvania court and the defendant caused the suit to be removed to the United States District Court for the Western District of Pennsylvania. The jury returned a verdict for the plaintiffs and judgment was entered thereon. The defendant has appealed.

The plaintiffs allege that an oral contract between them and the defendant was entered into in Indiana at the meeting be-

tween Osler and Matthews in January, 1936. They do not, however, ask for damages for breach of this contract, because they concede that the Indiana Statute of Frauds (Sec. 7462, Burns' R.S. 1914, Sec. 33-101, Burns' Ann.St.) is applicable and that this statute prohibits actions upon agreements not to be performed within the year unless executed by the party to be charged. They seek recovery of the money value of the privilege to make use of the Matthews inventions, which the defendant had exercised from 1934 to 1937. The action is for restitution on a quantum meruit basis. The general principle applicable to such an action is found in Section 1 of the Restitution Restatement and comments thereto.[1]

 That such an action is available to a party who has partly performed an agreement unenforceable because of the Statute of Frauds is succinctly stated in Williston on Contracts, Vol. 2, Section 534, p. 1546, in which that learned author says: "Whether an agreement obnoxious to the Statute of Frauds is void or merely unenforceable, one who has partly performed the agreement and who is not in default in continuing performance should be compensated for any benefit which he has furnished the other party if the latter refuses to perform." Section 355 of the Contracts Restatement, read in the light of sections 347 and 348 is to the same effect. The plaintiffs contend that the privilege to use the information concerning the three Matthews inventions was a benefit to the defendant. They contend further that the retention of this benefit by the defendant would be unjust since such use was permitted by the plaintiffs only because of their justifiable belief that the defendant was about to enter into a license agreement with them. To the first contention the defendant answers that it received no benefit and points to the fact that it manufactured the Matthews flying shear at a loss of $135,000. Obviously the defendant was not enriched in the every day usage of that term but this does not preclude the possibility that the right to use the inventions, to experiment with them, to prevent or at least postpone their use by a competitor and to make bids to the trade based on the inventions was in fact a benefit to the defendant. Matthews so testified and the jury may and probably did believe this to be so. The defendant asks us to find that it did not unjustly retain any benefits because Matthews had been unable to interest any other company in the industry in his inventions and because all that Matthews sought was found in the defendant when it, a reputable firm, attempted in good faith to exploit his inventions.

That the plaintiffs sought more than the exploitation of the Matthews inventions is apparent from our brief recital of the negotiations, for throughout those negotiations recurs the provision for minimum royalties. Specifically, in the fifth draft, which according to Matthews was accepted by Osler as embodying the terms of the agreement, provision is made for minimum royalties in 1936 and 1937 to be paid even though there were no sales of machinery embodying the Matthews inventions. This provision for payments to the plaintiffs without regard to the financial returns to the defendant is a clear indication that the parties themselves believed that the privilege to use the inventions had value.

 At the trial the plaintiffs introduced as an expert witness an attorney who had specialized in patent law for about twenty years and was conversant with patents in the steel mill industry. He testified that the right to use the Matthews devices had value and gave as his opinion that the value was from $25,000 to $30,000. He asserted that he was familiar with the state of the

---

[1] "A person who has been unjustly enriched at the expense of another is required to make restitution to the other."

"Comment a. A person is enriched if he has received a benefit. * * * A person is unjustly enriched if the retention of the benefit would be unjust. * * * "

"Comment b. A person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage. He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss. The word 'benefit', therefore, denotes any form of advantage. The advantage for which a person ordinarily must pay is pecuniary advantage; it is not, however, necessarily so limited, as where a physician attends an insensible person who is saved subsequent pain or who receives thereby a greater chance of living."

art relating to the rolling of steel in 1934 and that he had examined Matthews' applications. He was asked by hypothetical question what was "* * * the reasonable value, or the market value, of the rights [in the applications] which were enjoyed and used by the defendant between August, 1934, and June, 1937 * * *." In his answer the witness reflected Matthews' own testimony to a considerable degree. Matthews had testified to long experience in the designing and building "* * * of all kinds of rolling mills machinery, including the modern high-speed strip mills which we are all hearing so much about today." We cannot say in view of this background that the answer of the patent attorney to the value of the applications was inadmissible. Upon the contrary we think that the statement of the attorney was entitled to credit if the jury wished to accept it. Inartistically as this evidence was presented, the expert did address himself to the issue and what he said was pertinent as to the value of the applications for exploitation. See General Paint Corporation v. Kramer, 10 Cir., 68 F.2d 40, and Jenkins Petroleum Process Co. v. Sinclair Refining Co., 1 Cir., 62 F.2d 663, 665.

It must be remembered that the jury had before it other evidence as to value of the applications. There was the evidence as to minimum royalties, which Matthews contended were part of the oral contract. There was testimony to the effect that Jones had included the sum of $10,000 in the bid to American Sheet and Tin Plate Company as part compensation to Matthews for the flying shear to be used at that Company's plant. The question as to whether or not Jones had power to bind his company in including this sum in the estimate is immaterial. If the jury believed Matthews, we think it must be conceded that Jones' estimate of value for the shear in connection with the American Sheet and Tin Plate Company is entitled to some weight.

■ It has been held frequently that at least one element of proof of damage in such cases as that at bar is the value which the parties themselves put upon the property which was transferred. See Clark v. United States, 95 U.S. 539, 543, 24 L.Ed. 518; General Paint Corporation v. Kramer, supra; Zachry v. Nolan, 5 Cir., 66 F. 467, 471; Oxborough v. St. Martin, 169 Minn. 72, 210 N.W. 854, 49 A.L.R. 1115; McGilchrist v. F. W. Woolworth Co., 138

Or. 679, 7 P.2d 982; and Williston on Contracts, Vol. 2, Section 536, p. 1557.

■ The appellant makes much of the fact that the hypothetical question asked of the patent attorney did not include an inquiry as to the value of Matthews' applications in the light of the Steckel patents and that the expert witness did not testify that in his opinion the Matthews' applications were valid over the Steckel patents. In an art as thoroughly exploited as that of manufacturing sheet, strip or plate steel it is doubtful if the validity of many patents can be determined without litigation. The question of the validity of Matthews' applications was one which must have been always present in the minds of the appellant's officers. Both parties assumed that the applications were valid over the prior art and took positions accordingly. The appellant's contention is really to the effect that the appellees must prove the validity of the application in order to establish value in them. This contention is naive.

We have carefully examined the charge of the trial court and can perceive no error in it. Upon the contrary we think that the learned District Judge charged well upon a difficult subject.

The judgment of the court below is affirmed.