Drake, Oh. J.,
delivered the opinion of the court:
There is no controversy in this case over the claim sued on, a voucher for $3,400, issued to the claimant for a balance due for plumbing work done by him on the United States ship Quinnebaug in 1875. The whole amount earned by .him for that work was $9,600. In partial settlements with him he was charged $2,100 and $200 for certain old material which had been delivered to him by Naval Constructor Steele at Philadelphia, under assumed authority from the Navy Department. It is with that old material that the counter-claim is connected.
The claimant is content to be charged with those items, claiming that the old material was lawfully delivered to him ; that it was, by competent authority, valued at those sums; that the defendants are thereby concluded as to the value, and that therefore the account ought to stand as it is.
On the other hand, the defendants contend that the old material was not lawfully delivered to him; that it was not, by competent authority, valued at, those or any other sums; that he unlawfully received it, and is therefore bound to account to the defendants for it; that though he was charged for it only $2,300, he actually sold 98,748 pounds of it for $8,975.56; to recover which amount from him, less the amount of his just claim against the government, for work done, is the object of the. counter-claim.
The facts and documents connected with the counter-claim are set forth fully in the findings, and therefore no more of them need be recounted here than is necessary to a due presentation of the grounds of the conclusions reached by the court.
Before stating the facts it is proper to refer to a feature of the case which has attracted our notice, namely, the unusual number of instances in which matters do not appear which might have been reasonably expected to appear. So far as the non-appearance of those facts may unfavorably affect the claimant’s interests, he has no ground for complaint, for he was examined by the defendants as a witness, and his testimony was offered in evidence by the defendants at the trial, so that he *194 had the full benefit of it. If, therefore, he failed in his testimony to unfold the transaction in all its details, it is his misfortune, if not his fault, that facts important to his defense against the counter-claim, if such facts existed, do not appear.
We will now briefly state the facts which have been found bearing on the counter-claim.
In March, 1875, the claimant, learning that plumbing work had to be done on the Quinnebaug, came from Philadelphia to Washington, and had a private interview in regard thereto with Isaiah Hanscom, chief of the Bureau of Construction and Repair, in Hanscom’s office, with no third person present. All that appears in regard to that interview is stated in finding III, where it is found that some verbal understanding was had between the claimant and Hanscom for the claimant to do the needed work on the Quinnebaug; that Hanscom gave the claimant verbal instructions to go on with the work ; that the matter of using in the Quinnebaug old material taken out of other vessels was talked of, and that Hanscom spoke of the old material being of the value of $2,000. What particular material or what quantity of material was referred to by Hans-com is nowhere shown.
This is all that appears in regard to that interview. Upon that slender foundation it was contended by claimant’s counsel that a verbal agreement was made between the claimant and Hanscom, and that in pursuance of that agreement the old material was rightfully delivered to the claimant. But this theory is conclusively rebutted by the claimant’s own act in making to Hanscom a subsequent written proposition to do the work, without referring in the slightest way to that interview, and by the fact that he never did a stroke of work on the Quinne-baug until after the 2d of August, and then not in pursuance of a verbal agreement in March, but of a letter of Hanscom to him, dated the 30th of July. But even supposing there was such a verbal agreement, did it make a contract binding the government 7 Manifestly not; for section 3744 of the Revised Statutes provides that “ it shall be the duty of the Secretary of War, of the Secretary of the Navy, and of the Secretary of the Interior to cause and require every contract made by them severally on behalf of the government, or by their officers under them appointed to make such contracts, to be reduced to *195 writing, and signed by the contracting parties, with their names at the end thereof.”
It was at one time contended that this section, as it stood in the Act June 2, 1862 (12 Stat. L., 411), was merely directory to the officers named in it, and not mandatory; but the Supreme Court of the United States held otherwise in Clark v. United States (95 U. S. R., 539), and said :
u The statute * * * makes it unlawful for contracting officers to make contracts in any other way than by writing signed by the parties. This is equivalent to prohibiting any other mode of making contracts. Every man is supposed to know the law. A party who makes a contract with an officer without having it reduced to writing is knowingly accessory to a violation of duty on his part. Such a party acts in the violation of the law. We are of opinion, therefore, that the contract itself is affected, and must conform to the requirements of the statute.”
In the presence of this statute, and this interpretation of it by the Supreme Court, it is utterly futile for the claimant to contend that his conversation with Hanscom had any force whatever as a contract binding the government.
After the interview between the claimant and Hanscom, the claimant returned to Philadelphia, and on the 6th of April, 1875, wrote to Hanscom a letter in these words:
“ Sir : I will furnish all material and labor for the plumbing of the United States steamer Quinnebaug, according to the requirements of the service, and to the satisfaction of the inspecting officer, for the.sum of $14,500, and will take, in whole or part payment, any old brass or lead arising from old vessels that can be reworked for that purpose.”
This proposal was never agreed to by the Bureau of Construction and Repair, and therefore it has no bearing on the determination of this case.
On the receipt of that letter the bureau directed Naval Constructor Hartt, at the Philadelphia.navy-yard, to draw up specifications of the plumbing work to be done on the Quinnebaug, and to obtain proposals from the ship plumbers in the vicinity to do the work. Such proposals were received, and among them that of the claimant; but none of them was accepted.
A verbal proposition was then made, before the 15th of April, to the claimant, but by whom does not appear, that if he *196 would do the work for $12,000 he could do it, and might .proceed at once with it.
The foregoing are all the facts, which existed prior to the 15th of April, 1875, and they show that up to that date there had been no sort of contract between the claimant and the bureau.
Immediately following that date were the transactions out of which has grown the present controversy, which may be succinctly stated as follows:
On that day the bureau sent to Naval Constructor Steele, at Philadelphia, an order to—
“ Have all the old lead, brass, and composition arising from breaking up the monitors, including the Amphitrite, Miantono-moh, and Terror, at the establishments of Messrs. Harlan & Hollingsworth, John Eoach, and Win. Cramp & Sons, carefully weighed, boxed up, and sent to Philadelphia; and report the amount to the bureau.”
Naval Constructor Steele, interpreting this letter as an authority to him to deliver to the claimant the old material referred to, proceeded to deliver to him, from time to time, old material to the amount of 103,949 pounds as follows: On or before April 29, 49,399 pounds, in the month of May, 44,775 pounds, and between May 31 and July 7, 9,775 pounds.
On the 7th of July ensuing the claimant gave to Naval O n-structor Steele two receipts for old material aggregating the said quantity of 103,949 pounds.
It is for the money received by the claimant from the sale of 98,748 pounds of this old material that the defendants seek a recovery here in counter-claim, and in that connection the first question is, whether the old material was lawfully ’delivered to the claimant.
In connection with this delivery is one of the remarkable features of this case. The findings disclose no real explanation of the transaction, though we had before us at the trial the deposition of the claimant and a long report made by Naval Constructor Steele about the matter. It is not pretended that Naval Constructor Steele received any order from a superior officer to make it. So far as appears, it was altogether his own act, resting solely on his own interpretation of the above bureau order of April 15th to him to have the old material sent to Philadelphia.
*197 How he could have found in the words of that order any even distant seeming of an authority to him to turn the material over to the claimant passes any comprehension we have been able to exercise on the subject. There is not the least reference to the claimant, not the least authority or permission to deliver possession of the material to any one, but, on the contrary, a mere order to have it brought to Philadelphia and then “ report the amount to the bureau.” This was tantamount to an express order to him to hold the material until otherwise ordered by the bureau. For him to let it pass from his control without authority from the Navy Department, was, to state it mildly, a clear violation of his official duty; and, being such, his act- in letting it pass into the claimant’s possession could not give the claimant any right or title whatever to or in the material.
Not only so, but in delivering the property in question to the claimant, he violated express statutes directly bearing on such a case. Section 1511 of the Revised Statutes is in these words:
“ The Secretary of the Navy is authorized and directed to sell, at public sale, such vessels and materials of the United States Navy as, in his judgment, cannot be advantageously used, repaired, or fitted out; and he shall, at the opening of each session of Congress, make a full report to Congress of all vessels and materials sold, the parties buying the same, and the amounts realized therefrom, together with such other facts as may be necessary to a full understanding of his acts.”
When a statute directs a public officer to do a certain thing in a certain way, it is a prohibition of his doing it in any other way, and takes from him all discretion as to how it shall be done. This section not only authorized, but directed, that material which cannot be advantageously used, should be sold, not turned over to a contractor, in consideration of work done by him for the government; and should be sold at public sale, not bartered away in. a private transaction, however honest it might be. And that the Congress might be able to exercise strict supervision over every such matter, the remarkable rule is laid down that the Secretary of the Navy shall at the opening of the next session of Congress make to that body u a full report of * * * all materials sold, the. parties buying the same, and the amount realized therefrom, together with such other facts as may be necessary to a full understanding of his acts.” We venture the supposition, that in the whole body of *198 the Revised Statutes there can hardly be found any description of official action more completely hedged in by restrictive safeguards than this very one of selling old material of the Navy. But there is further legislation bearing on this subject.
Section 3618 of the Revised Statutes provides that—
“All proceeds of sales of old material * * * shall be deposited and covered into the Treasury as miscellaneous receipts, on account of ‘ proceeds of government property,’ and shall not be withdrawn or applied, except in consequence of a subsequent appropriation made by law.”
The effect of those two comprehensive provisions, in our opinion, is to forbid, in the strongest terms, the use of old material in payment for work to be done, or in exchange for other material or for work. If old material can be advantageously used, it must be used by the proper officers for government purposes; if it cannot be advantageously used, then it must be sold at public sale, and the proceeds of the sale must not be “ applied” in payment for other material, or for work, or for any other purpose, but be covered into the Treasury. And yet in the face of .these provisions Naval Constructor Steele turned over to the claimant 103,949 pounds of old material.
It is quite vain to say that the claimant was an innocent receiver of the material, believing that Naval Constructor Steele had a right to deliver it to him; and therefore that he should not be made to suffer the loss consequent on a recovery under the counter-claim. He knew that he was dealing with a public officer; and no doctrine of law is better settled in this court, and everywhere else, so far as we know, than that he who deals with such an officer is bound to know whether the officer’s acts are within the scope of his lawful authority. It was perfectly open to the claimant to have ascertained whether Naval Constructor Steele had lawful power to turn ovpr that property to him; but, so far as appears, he made not the least inquiry on that point. He, therefore, must bear the responsibility of any untoward results to himself from his own failure to make proper inquiry.
But it was contended by claimant’s counsel that, “ assuming that the Navy Department had no right to make payment partly in old material, yet they did it, and there is an end.” We notice this proposition merely out of respect to the counsel, and not because it seems to us'to have any weight.
*199 It is simply an assertion, that if a public officer, no matter how unlawfully, turns over government property to a supposed contractor, in payment for work done by him, the government is concluded by that unlawful act, and cannot hold the receiver of the property liable for its value. It is a noteworthy evidence of the willingness of this court to hear in every case all that counsel see fit to urge, that it would listen for a moment to a proposition so utterly baseless and indefensible as that.
The sum of the whole matter is, that the claimant, long before any sort of agreement was made between him and the bureau for work on the Quinnebaug, and when he gave no sort of consideration for the delivery of the old material to him, unlawfully received and sold 98,748 pounds of old material, the property of the defendants, and that he is liable to the defendants therefor.
This brings us to the question of the amount recoverable under the counter-claim. The counter-claim is for money had and received by the claimant for the use of the defendants. As the claimant did not show what expenses, if any, he was put to in preparing the old material for sale, we have nothing ■ before us upon which he could base a demand upon us to reduce the amount found to have been received by him from the sale of it.
The findings show that for the 98,748 pounds of old material which the claimant sold he received---- $8,975 56
Add to this the three small lots of material set forth in finding XI............................... 300 00
And cash paid him as shown in finding XIII ..... 3,900 00
And the total amount received by him was....... 13,175 56
Against this he is entitled to a credit for the whole work done by him on the Quinnebaug of........ 9,600 00
Leaving balance due from him to the defendants .. 3,575 56
For this balance judgment will be entered in favor of the defendants against the claimant.