Campbell, Chief Justice,
delivered the opinion of the court:
This case is before the court upon demurrer to the petition.
The plaintiff claims to have purchased three lots of sodium nitrate belonging to the Government, located at Middletown, Pa., Nitro, W. Va., and Jacksonville, Tenn., at an auction sale authorized by the Secretary of War. The petition alleges with care and detail the facts relied upon to establish the sale and purchase, and the plaintiff’s willingness to comply with the advertised terms. The Secretary refused to approve the price bid for the property or to enter into contract for its delivery. It is averred that the Secretary of War caused to be circulated an advertisement of a public sale, at auction, of approximately 40,000 tons of sodium nitrate, located at the three places mentioned, upon terms stated in the advertisement, which is made Exhibit B to the petition. This Exhibit B purports to fix the time and place of the proposed “ sale by auction,” with a description of the lots of nitrate, stating in general terms its quality, with a reservation that the Government did not guarantee the quality, and, under a heading of “ terms of sale,” stating that the material would be sold “ as is ” “ where is ” in its present condition at the several plants. It was required that a purchaser make a deposit in cash or United States bonds of 10 per cent of his bid, which would be “ retained by the United States to apply against the last shipment of the sodium nitrate on the contract with the purchaser.” Distinguishing between purchases of 500 tons or less and those in excess of 500 tons, it is stated in Exhibit B that in the latter case the purchaser would be required “ upon acceptance of his bid and before delivery of nitrate to enter into a written contract embodying ” certain terms, and to give bond in double amount of his bid, “ with surety acceptable to the Secretary of War,” conditioned upon the faithful performance of the contract. A clause appearing in this exhibit and dwelt on in argument is as follows:
“Acceptance by the Government of any bid will not be final until the execution of a contract and bond, and upon *263 failure by the purchaser within ten days after notice of the acceptance of his bid to execute said contract the Government may withdraw such acceptance and make such disposition of said nitrate as it may desire free of any claim of purchaser, in which event the 10% theretofore paid upon the acceptance, of said bid shall be forfeited to the United States as liquidated damages.”
It is averred that “ the Secretary of War, by Robert Fox, his duly appointed auctioneer, did offer for sale as a part of the sodium nitrate so advertised for sale,” one lot of 13,920 short tons located at Middletown; that plaintiff bid for the same “ upon the terms and conditions offered in the circular advertisement of auction sale” the sum of $25 per ton; that this was the highest bid for this lot, and that “ the same was then and there knocked down and sold to this claimant at the said price, upon the terms and conditions set forth” in Exhibit B. The plaintiff made the 10 per cent deposit, and by its duly authorized agent called upon the Secretary of War prepared to enter into the contemplated contract, but that official refused to make the contract and declared the price inadequate. As to the other two lots of nitrate the petition makes similar averments of purchase at said sale, and avers the deposit of the required 10 per cent, the offer to enter into contracts and the Secretary’s refusal, as already stated.
The plaintiff therefore claims that it became the purchaser at the alleged auction sale of the three lots of sodium nitrate; that it purchased one lot of 13,920 tons at $25 per ton, which on the date of sale, and to and including the day of the rejection of its bid, was of the market value of $63.60 per ton; another lot of 5,000 tons at $25 per ton, which on these dates was of the fair market value of $66.08 per ton; and the third lot of 10,600 tons at $22.50 per ton, which was of the fair market value of $66.43 per ton. The aggregate amount of its bids was $711,500, and the aggregate amount at the stated fair market value of the nitrate was $1,919,870. The difference between these sums, or $1,208,370, the plaintiff claims it is entitled to recover in this suit.
The law under which plaintiff claims the Secretary acted in authorizing the auction sale is a proviso in the act of *264 July 11, 1919, making appropriations for the Army, 41 Stat. 105, reading as follows :
“ Provided further, That in addition to the delivery of the property heretofore authorized to be delivered to the Public Health Service, the Department of Agriculture, and the Post Office Department of the Government, the Secretary of War be, and he is hereby, authorized to sell any surplus supplies, including motor trucks and automobiles now owned by and in the possession of the Government for the use of the War Department to any State or municipal subdivision thereof, or to any corporation or individual upon such terms as may be deemed best.”
There were several statutes purporting to regulate sales of materials and products acquired before or during the war. There were also several enactments relating peculiarly to nitrates. The national defense act of June 3, 1916, 39 Stat. 215, authorized the President to construct plants for the production of nitrates and other products for munitions of war and useful in the manufacture of fertilizers, and provided that the products of such plants should be used by him for military and naval purposes “ to the extent that he may deem necessary, and any surplus which he shall determine is not required shall be sold and disposed of by him under such regulations as he may prescribe.” Section 27 of the act of August 10, 1917, 40 Stat. 287, authorized the President to procure, or aid in procuring, stocks of nitrate of soda found to be necessary and available for increasing agricultural production during the years 1917 and 1918, and to make such regulations as he might deem proper to carry out that purpose. This was extended for the purposes named to the duration of the war by the urgent deficiencies act of October 1,1918, making appropriations for the Department of Agriculture, 40 Stat. 1007; the moneys received for or in connection with the disposition of nitrate of soda pursuant to section 27 above mentioned were made available as a revolving fund to be used at the discretion of the President for extending the operation of that section, and provided that nothing in this last act should be construed as pi’ohibiting the sale or disposal of nitrate remaining on hand at the time of the termination of the war. The prime purpose of producing these nitrates, so far as authorized by the national defense act, may *265 liave been for the use of the Army and Naval Establishments, but, coupled closely with that purpose in this act and an intention running through the other acts mentioned, was that sodium nitrate was to be made or procured to aid in agricultural production. This is shown clearly by the joint resolution of April 23,1920, 41 Stat. 573, whereby the Secretary of War was authorized to sell for cash “ at the prevailing market price at the time of the sale” 100,000 tons of nitrate of soda, then held as a reserve supply of the War Department, the authorized sale to be made to users and distributors and in quantities of not exceeding 100 tons to any one purchaser.
Certain statutes had authorized the delivery of property by the Secretary of War to three other departments, as follows : By the act of March 3, 1919, 40 Stat. 1303, the Secretary of War was directed to transfer, without charge, for the use of the Public Health Service such hospital furniture and equipment, including hospital and medical supplies, motor trucks, and other vehicles, not required by the War Department, “ as may be required by the Public Health Service for its hospitals.” By the act of February 28,1919, making appropriations for the Post Office Department, 40 Stat. 1194, the Secretary of War and the Secretary of the Navy were directed to deliver to the Postmaster General upon his request and as provided in the act such airplane machines, supplies, equipment, and parts as were serviceable and available for “ the airplane mail service,” the same to be out of any equipment on hand or under construction. Section 7 of this same act, 40 Stat. 1201, authorized the Secretary of War in his discretion to transfer to the Secretary of Agriculture “ all available war material, equipment, and supplies not needed for the purposes of the War Department, but suitable for use in the improvement of highways,” and their distribution among the highway departments of the several States. It is to these provisions in the two acts mentioned that the proviso in the act of July 11 refers when it says that “ in addition ” to the delivery of the property to the Public Health Service, the Department of Agriculture, and the Post Office Department, the Secretary of War was authorized "to sell “ any surplus supplies, including motor *266 trucks and automobiles” in possession of tbe Government, “ for the use of the War Department,” to any State or person upon such terms as may be deemed best. By the act of March 15, 1920, 41 Stat. 530, the transfer of certain surplus motor-propelled vehicles, equipment, and material was again authorized, that to be transferred to the Department of Agriculture being more specifically named, and all in accordance with the act of February 28, 1919, already mentioned. This act of March 15 provides that the proviso in the act of July 11 now under consideration was not to be construed as amended or repealed by this act, except as to the transfer of those articles specifically named to be transferred to the Department of Agriculture. This act accentuates the fact that the supplies which the act of July 11 authorized to be sold by the Secretary of War were surplus supplies held for the use of the War Department.
There were other acts authorizing sales of war supplies and other materials. The act of May 10,1918, 40 Stat. 548, empowered the President during the existing emergency, in his discretion and upon such terms as he should deem expedient, through the head of any executive department, to sell any supplies, materials, equipment, or other property “ heretofore or hereafter acquired by the United States in connection with, or incidental to, the prosecution of the war.” This was followed by the act of July 9,1918, 40 Stat. 850, which empowered the President, through the head of any executive department, to sell “ upon such terms as the head of such department shall deem expedient * * * any war supplies, material, and equipment, and any byproducts thereof, and any buildings,” etc., acquired since April 6, 1917.
It is not to be presumed that Congress intended by the act of July 11 to take away from the President the power of disposition authorized by the act of July 9,1918, and in view of these statutes, and especially of the legislation addressed peculiarly to the production and disposition of nitrates, it is open to serious question whether the act of July 11 contemplated the sale of sodium nitrate under the general designa' tion of “ surplus supplies ” for the use of the War Department referred to in the act. If it authorized sales of nitrate *267 by the Secretary upon such terms as he might deem best, including sales at auction, it is strange that by a joint resolution subsequently passed it was deemed necessary to authorize a sale of 100,000 tons of the reserve supply at the stated market price and in limited quantities to each purchaser. That the joint resolution was a limitation on the authority conferred by the act of July 11 we think there can be no question if it were conceded that the act ever authorized a sale of sodium nitrate.
But in the view we take of this case it is not necessary to dwell upon the distinction between the several acts or to go to the extent of holding that the act of July 11 did not authorize a sale of the nitrate in question.
The plaintiff contends that the sale was an auction sale, as the term is generally understood, and that when the auctioneer’s hammer fell on its bids they constituted acceptances by the United States, and completed binding contracts of sale, passing title to plaintiff. It may be conceded that at an ordinary auction sale the rule as stated by plaintiff generally prevails that “ as soon as the hammer falls ” the bargain is considered as concluded. But in sales under a statute such as we are considering, or in the absence of statutory authority with appropriate regulations governing the same, a sale of Government property is not effected by “ the fall of the hammer.” The applicable rule in such cases is more analogous to that governing judicial sales than to auction sales where the property is knocked down by an auctioneer to the highest bidder. At a judicial sale, though conducted to all appearances as an auction, at public outcry the bid is in legal effect only an offer to take the property at the price bid, and the acceptance or rejection of that offer is within the equitable discretion of the court. Such a sale is not final, nor can the purchaser have a legal title to the property he means to buy and has bid for until the sale is confirmed. Camden v. Mayhew, 129 U. S. 73, 82; Nalle v. Young, 160 U. S. 624, 637; Ballentyne v. Smith, 205 U. S. 285, 290. The sale in question was not a judicial sale, but the only authority for it must be found in the act of Congress- under which the Secretary proceeded. The statutes mentioned, which purport to authorize sales by the Secre *268 tary, repose a power and authority in the exercise of which judgment and discretion must be used. He can say when a sale shall be made and pass upon the sufficiency of the price. It may be conceded that the method of securing bids is determinable by him. But an auctioneer has no such power and is not the person in whom the statute confides authority. The Secretaxy may not thus divest himself of it. The sale, if such it may be called, was not final, and no title passed until the bid (or the contemplated contract) was finally approved by the official who lawfully represented the Government and in whom was vested judgment and discretion to make a sale. The most that can be claimed for the bids at the alleged auction sale is that they were proposals which the Secretary could accept, and until they were duly accepted by him there was no approval of them and consequently no sale.
There are statutes and appropriate regulations affecting sales of Government property at auction. See secs. 1241, 1541, Army Regulations (1917), 680, 710. These statutes are strictly construed. Cooper’s case, 1 C. Cls., 85; Steele case, 19 C. Cls., 181; 113 U. S., 128. In the last-named case this court held that where the act provided for a public sale an attempted private sale was void, saying that when a statute directs a public officer to do a certain thing in a certain way it is a prohibition of his doing it in any other way. The Supreme Court affirming the judgment held that the appellant was chargeable with knowledge of the fact that the sale was illegal. In the instant case there was no statutory direction to sell at public auction, and authority to make such a sale binding upon the Government at the fall of the auctioneer’s hammer can not be implied. The Secretary of War evidently did not deem the bid at auction or the knocking down of the property by the auctioneer to have concluded the matter. He did not proceed upon the theory of sale which plaintiff insists upon, and on the contrary he refused to treat it as a consummated transaction. The advertisement of the sale, we think, notified persons submitting bids that they were subject to approval. And if the printed notice had been less definite the law itself was a sufficient *269 notice of its terms and of the powers conferred by it. Everyone must take notice of the extent of authority conferred by law upon a person acting in an official capacity. Different rules prevail in respect to the acts and declarations of public agents from those which ordinarily govern in the case of mere private agents. See Whiteside case, 93 U. S., 247.
The demurrer to the petition should be sustained and the petition dismissed. And it is so ordered.
Graham, Judge; Hay, Judge; DowNEr, Judge; and Booth, Judge.) concur.